993 P.2d 1130

**Janet I. SABINA and William E. Sabina, wife and husband, Plaintiffs–Appellants,**

**v.**

**YAVAPAI COUNTY FLOOD CONTROL DISTRICT, a political subdivision of the State of Arizona, Defendant–Appellee.**

**No. 1 CA–CV 98–0093.**

Court of Appeals of Arizona, Division 1, Department A.

Aug. 26, 1999.

Murphy, Lutey, Schmitt & Beck, P.L.L.C. by Michael R. Murphy and Dan A. Wilson, Prescott, Attorneys for Plaintiffs–Appellants.

Charles R. Hastings, Yavapai County Attorney by Ethan A. Wolfinger, Deputy County Attorney, Prescott, Attorneys for Defendant–Appellee.

## OPINION

FIDEL, Judge.

¶ 1 Plaintiff Janet Sabina and her husband William sued the Yavapai County Flood Control District for injuries she sustained when she fell at night into an unlit, unguarded drainage ditch in the City of Sedona. The District does not own the ditch or the land that it traverses, but has power, for the purpose of floodplain management, to regulate construction and usage in the vicinity of the ditch. In the Sabinas' appeal from summary judgment in favor of the District, we consider whether the absence of guardrails or lighting along the ditch may be attributed to a breach of duty on the part of the District. Answering in the negative, we affirm.

### I. BACKGROUND

¶ 2 We consider the facts and inferences, as always, in the light most favorable to the parties opposing summary judgment.

### A. The Fall

¶ 3 On the night of November 18, 1993, Janet Sabina set out to attend a City Council meeting at Sedona City Hall, which stands within the Sedona Professional Plaza at the intersection of Hozoni and Southwest Drives. Mrs. Sabina parked on Hozoni Drive, which runs parallel to the eastern border of the Plaza. Between Hozoni Drive and the Plaza lies an unfenced, undeveloped, unlit right-of-way belonging to the City; within the right-of-way, running parallel to Hozoni Drive and

immediately adjoining the parking lot at the eastern border of the Plaza, lies an unguarded drainage ditch. Mrs. Sabina attempted to reach City Hall by walking across the right-of-way. As she did so, she fell into the ditch.

### B. Regulatory Authority Over the Ditch

¶ 4 The District, a political subdivision, was created by Yavapai County in 1981 to assume floodplain management powers and duties pursuant to Ariz.Rev.Stat. Ann. ("A.R.S.") § 48–3601 et seq. The ditch, a natural drainage course, and the land that it traverses were formerly owned by Yavapai County but were transferred to the City of Sedona when the City was incorporated in 1988. The City, as owner of the ditch, has the power and responsibility to maintain it, like other public ways within its boundaries. See, e.g., A.R.S. §§ 9–240(3), 9–254(5)(b), & 11–806.01(F). Because the ditch serves as a drainage course within a floodplain, however, it is subject to the District's oversight.

¶ 5 Specifically, pursuant to the District's statutory responsibility to adopt and enforce regulations for floodplain management, the District has undertaken by ordinance to restrict or prohibit uses within the floodplain that are dangerous to health, safety, and property due to water or erosion hazards; to control the alteration of waterways; and to prevent the construction of flood barriers that may divert floodwaters or increase flood hazards. See A.R.S. §§ 48–3603(D) and 48–3609(B); Yavapai County Flood Damage Prevention Ordinance 1987–1 § 1.4.[1]

¶ 6 In a section entitled "Abatement of Violations," the ordinance provides:

After discovery of a violation of this Ordinance, the District Administrator shall take such steps as he deems necessary to abate the violation as provided by this Ordinance and State law. The District Administrator shall give first priority to those violations which he deems pose the greatest potential for loss of life and property, or as directed by the District Board.

Id. at § 3.9.

¶ 7 A further section of the ordinance authorizes the District Administrator to commission engineering studies, establish setbacks, and take "other protection measures" to alleviate "hazards from eroding banks ... considered by the District Administrator to be severe." Id. at § 5.6(C). The ordinance establishes a minimum construction setback of 20 feet from the edge of a floodway or the bank of a watercourse. See id.

### C. District Notice of Erosion Attributable to the Ditch

¶ 8 In 1987, within a year after the Plaza was constructed, its owner informed the District that the Plaza was eroding along its eastern border where the Plaza parking lot adjoined the ditch. In 1989, the Plaza owner brought this same condition to the attention of the City, asserting that the City had the responsibility, as owner of the ditch, to remedy the condition and relieve the risk that the pavement might collapse when someone parked next to the ditch.

¶ 9 There followed a series of letters among representatives of the District, the City, and the owner. In 1989, the District informed the owner that the Plaza building had been constructed in violation of the 20-foot setback requirement, that the parking lot had been improperly constructed by filling in a portion of the ditch, and that the Plaza's application for a building permit had improperly omitted to identify the ditch. The District cautioned the owner not to con-

---

1. Section 1.4 provides:
   In order to accomplish its purposes, this ordinance includes methods and provisions for:
   A. Restricting or prohibiting uses which are dangerous to health, safety, and property due to water or erosion hazards, or which result in damaging increases in erosion or in flood heights or velocities;
   B. Requiring that uses vulnerable to floods, including facilities which serve such uses, be protected against flood damage at the time of initial construction;
   C. Controlling the alteration of natural floodplains, stream channels, and natural protective barriers, which help accommodate or channel flood waters;
   D. Controlling filling, grading, dredging, and other development which may increase flood damage; and
   E. Preventing or regulating the construction of flood barriers which will unnaturally divert flood waters or which may increase flood hazards in other areas.
   Yavapai County Ordinance 1987–1, § 1.4.

sider the District "responsible for the financial burden of mitigation," but added that the City and District had "the option of becoming directly involved in the solution to the erosion problem." The District advised the owner to submit a proposal to alleviate the problem, but warned that it could not "approve any mitigation plans that do not address the problem in its entirety."

¶ 10 In subsequent correspondence, representatives of the District, the City, and the owner discussed sharing the cost of mitigating the erosive juxtaposition of the ditch and parking lot. The District, however, had come to regard the problem as larger in scope and to regard the channel that included the ditch as "grossly undersized" to meet drainage needs that would arise during a "100 year runoff event." The District thus sought funding to participate in a larger project that would enlarge the channel and improve flood drainage over a more extensive part of the floodplain.

¶ 11 The owner eventually proposed to replace the ditch along Hozoni Drive with a closed culvert and swale, and in an August 1990 "Preliminary Report" transmitted to the City, the District described the proposal as "a viable interim improvement to solve the immediate problem of erosion to the City Hall parking lot and possible traffic safety hazard to Hopi Drive."[2] The District added that it "would have no objection to the installation of such a facility," but recommended against the owner's proposal to employ only a 60–inch culvert, which the District described as "so far undersized that it will not be compatible with a long-term solution for the area."

¶ 12 The owner and City did not press forward with a revised interim solution, nor did the District, in the exercise of its abatement powers, press them to do so. In October 1991, the District reminded the Plaza owner that the Plaza had not yet completed the steps outlined in 1989 to secure the District's approval for work in the channel, but the District set no deadline for the owner to do so. And although the District sought budgetary funding in 1992 and 1993 for a larger flood protection project, in both budgets such funding was denied. No work had been accomplished on the ditch or on any larger channel project by November 1993, when Mrs. Sabina fell.

### D. District Awareness of Hazard to Hozoni Bypassers

¶ 13 Although the District's correspondence with the Plaza owner and the City addressed problems and hazards of erosion on the Plaza side of the ditch, District officials who investigated the Plaza problem became aware that a possible hazard existed on the Hozoni Drive side as well. We have quoted from the October 1990 District Report that describes a buried culvert as "a viable interim improvement to solve the immediate problem of erosion to the City Hall parking lot and possible traffic safety hazard to Hopi Drive." Additionally, Elmer Claycomb, the District's Floodplain Administrator from 1988 to 1992, responded affirmatively when asked if "it ever occurred to him that the ditch in that general condition posed a danger to motorists, bicyclists or pedestrians." Claycomb stated that he recognized such a danger when he examined the ditch in response to the Plaza owner's demand for improvements. Jesus Romero, a District hydrologist, recognized a similar hazard when he went out to see the ditch.

¶ 14 Romero and Claycomb differed, however, over the District's authority to tell a property owner to install a guardrail to alleviate such a hazard. Romero stated that he, a hydrologist, lacked such authority, but that he read the ordinance as granting the director such authority. On the other hand, Claycomb, the director, stated that he lacked such authority under the ordinance:

> Q. And if you, say, saw a situation that you believed to be dangerous to pedestrians, to bicyclists, to motorists, that was within a drainage or floodplain, do you believe you had the regulatory power to tell the owner to . . . fix it?
>
> . . . .
>
> A. No.

**2.** Hozoni Drive was formerly called "Hopi Drive."

Q. Can you point to any statute or ordinance, county attorney opinion, or anything else that you rely on in giving us that answer?

A. What I point to is the lack of it. There is nothing in the ordinance that I can recall that dealt with that specific of— as you have put it, that was beyond the flood aspects, which is what the ordinance is about.

### E. The Lawsuit

¶ 15 After Mrs. Sabina's fall, the plaintiffs brought this negligence suit against the District, the City of Sedona, and the Plaza owners. The City settled with the plaintiffs, and the Plaza owners were granted summary judgment, from which the plaintiffs did not appeal. There then remained the plaintiffs' claim that Mrs. Sabina's fall was caused in part by the District's negligent exercise of regulatory authority over the safety of the ditch. On that claim, the District moved for summary judgment on three grounds: (1) no duty, (2) no proximate cause, and (3) statutory immunity. The trial court granted the District summary judgment without stating its grounds and then denied plaintiffs' motion for new trial. From both rulings the plaintiffs now appeal.

### II. IMMUNITY

¶ 16 We first consider and reject the District's claim of statutory immunity from liability. The gravamen of the complaint is that the District failed to exercise its regulatory power with sufficient diligence and persistence to press the Plaza and the City to a timely cure of the hazardous condition of the drainage ditch. Whatever the validity of this complaint upon the merits, the omissions that the plaintiffs complain of do not "fall within the narrow category of fundamental governmental policy making." *Fidelity Security Life Ins. v. Department of Ins.*, 191 Ariz. 222, 225, 954 P.2d 580, 583 (1998). They therefore fall outside the scope of A.R.S. § 12–820.01, which covers only "[t]he exercise of an administrative function involving . . . fundamental governmental policy." A.R.S. § 12–820.01(A)(2).

### III. DUTY AND CAUSATION

¶ 17 More substantial is the question whether summary judgment for the District may be sustained for lack of duty or proximate cause. As Prosser tells us, these categories often intersect. *See* W. Page Keeton, *et. al., Prosser and Keeton on the Law of Torts* § 42, 274 (5th ed. 1984) ("It is quite possible to state every question which arises in connection with 'proximate cause' in the form of a single question: was the defendant under a duty to protect the plaintiff against the event which did in fact occur?"). This case brings us precisely to the intersection of duty and proximate cause, where we find (1) that defendant had, and breached, a duty to the general public, but (2) that the injury to Mrs. Sabina did not fall within the range of defendant's duty or within the range of unreasonable risks that defendant generated by its breach.

¶ 18 Whether the defendant owed the plaintiff a duty is generally a legal question for the court to decide. *See Alhambra Sch. Dist. v. Superior Ct.*, 165 Ariz. 38, 41, 796 P.2d 470, 473 (1990). If we confine ourselves to the first part of Prosser's question—was the defendant under any sort of duty—and defer addressing the second part—did the duty encompass the event which did in fact occur—the answer to the first part undisputably is yes. The District had the regulatory duty to restrict or prohibit floodplain uses that were "dangerous to health, safety, and property *due to water or erosion hazards.*" Yavapai County Ordinance 1987–1, § 1.4 (emphasis added). And in performance of that regulatory duty, the District had the common law duty "to act reasonably in the light of foreseeable and unreasonable risks." *Rogers v. Retrum*, 170 Ariz. 399, 400, 825 P.2d 20, 21 (App.1991).

¶ 19 If taken most favorably to the plaintiffs, the facts further establish that the District was negligent in the performance of its regulatory and common law duty. Aware for six years that the Plaza parking lot was eroding and crumbling into the ditch, the District should have foreseen an unreasonable risk of harm to persons driving, parking, or walking *on the Plaza side of the ditch;* yet the District failed to use its regulatory pow-

ers to effectuate a timely cure. From these facts, a jury could find the District negligent.

¶ 20 Yet negligence is not actionable in the abstract. Unless the injury to the plaintiff falls within *the range* of the defendant's duty, the defendant is not liable even though it may have acted negligently in light of the foreseeable risks. *See Markowitz v. Arizona Parks Bd.*, 146 Ariz. 352, 356, 706 P.2d 364, 368 (1985); *cf. Rossell v. Volkswagen of America*, 147 Ariz. 160, 169, 709 P.2d 517, 526 (1985) ("The question is whether the plaintiff was in the foreseeable range of defendant's negligent conduct ... and whether the injury resulted from the recognizable risk that made that conduct negligent.").

¶ 21 To examine "the foreseeable range of defendant's negligent conduct" and to ask "whether the injury resulted from the recognizable risk that made that conduct negligent," is another way of asking the second part of Prosser's causal question: did the District's duty encompass protecting a person such as the plaintiff from such an event as did in fact occur? *See* Prosser & Keeton, *supra,* § 42 at 274; *see also Rogers,* 170 Ariz. at 400, 825 P.2d at 21 ("The first question in a negligence case is whether the defendants owed a duty to the plaintiff.").

¶ 22 To define the range of the District's duty, we first consider what this case is not. It does not arise from the erosive juxtaposition of the Plaza parking lot and the ditch; Mrs. Sabina did not drive or walk over a stretch of parking lot that fell into the ditch. Nor does it arise from the Plaza setback violation; Mrs. Sabina did not fall on the Plaza side of the ditch, and the impermissible proximity of the eastern border of the Plaza to the western edge of the ditch—another erosion-related hazard—had nothing to do with her fall. Nor does it arise from a flow of floodwaters that the ditch could not contain; as far as we can tell from the record, when Mrs. Sabina fell, the ditch and its environs were dry.

¶ 23 In short, neither water nor erosion played any part in Mrs. Sabina's fall. Had they· done so—had the Plaza parking lot crumbled beneath her wheel or feet—Mrs.

Sabina's injury would indeed have fallen within the foreseeable range of the defendant's duty to protect the public health, safety, and property from water or erosion hazards. *See* Yavapai County Ordinance 1987–1, § 1.4. Such a case would have resembled *Daggett v. Maricopa County,* 160 Ariz. 80, 770 P.2d 384 (App.1989), where a water park patron's injury fell within the range of the county's duty to reasonably exercise its regulatory function to conduct safety inspections at water parks. *See id.* at 84–85, 770 P.2d at 388–89.

¶ 24 What caused Mrs. Sabina's injury, however, was neither a water hazard nor an erosion hazard; it was an absence of lighting or a barrier to prevent a bypasser on the Hozoni Drive side from stepping into the ditch. Such an injury was well beyond "the foreseeable range" of defendant's negligent failure to accomplish a remedy to the Plaza-side setback and erosion problems, and did not "result[ ] from the recognizable risk that made that conduct negligent." *Rossell,* 147 Ariz. at 169, 709 P.2d at 526.

¶ 25 The plaintiffs contend, however, that the absence of lighting or a barrier, even though not water or erosion hazards, nonetheless came within the scope of the District's general regulatory responsibility to "promote the public health, safety, and general welfare." *See* Yavapai County Ordinance 1987–1, §§ 1.1., 1.3 & 1.4. We disagree.

¶ 26 Although the plaintiffs invoke the District's responsibility to "promote the public health, safety, and general welfare" as a source of an omnibus regulatory power, the plaintiffs ignore the limiting context of the District's regulatory power. That context is· evident from the ordinance's very title— "Flood Damage Prevention Ordinance." It is evident from section 1.4(A), which assigns the District power to "restrict[ ] or prohibit[ ] uses which are dangerous to health, safety, and property *due to water or erosion hazards.*" Yavapai County Ordinance 1987–1, § 1.4(A) (emphasis added). It is evident from the "Statement of Purpose," which identifies numerous examples of threats to

health, safety, and welfare that arise from flooding or erosion. *See id.* at § 1.3.[3]

¶ 27 The same disregard for context undermines the plaintiffs' effort to extract an omnibus safety responsibility from the acknowledgement by District deponents that the District "needed to regulate for safety, not just to protect someone from getting wet." The ordinance identifies numerous regulatory safety concerns—for example, the collapse of land or occupied structures, the impairment of bridges or power lines or roadways or sewers—that arise from flooding or erosion but do not depend on "someone getting wet."

¶ 28 We are also unpersuaded by a District hydrologist's impression—an impression not shared by the director—that the ordinance authorized the director to tell property owners to install guardrails along ditches to protect motorists or pedestrians from falling in.[4] We interpret the ordinance *de novo. Cf. Phoenix Newspapers, Inc. v. Department of Econ. Sec.*, 186 Ariz. 446, 448, 924 P.2d 450, 452 (App.1996) (interpretation of statute is question of law which court reviews *de novo*). Like the director, we find no omnibus authority to order traffic safety improvements within an ordinance directed to flood control and to the prevention of water and erosion hazards.

¶ 29 We come last to the fact that District officials observed, when inspecting the Plaza-side erosion problem, that the absence of a barrier on the Hozoni side posed a potential danger to motorists, bicyclists, and pedestrians. To observe such a hazard did not, in our opinion, bring it within the range of the District's regulatory responsibility. We reiterate that the City, not the District, owned the ditch, and the plaintiffs have settled with the City; the District's responsibility with respect to the ditch was to attend to flood control and to the prevention of water and erosion hazards. There are many flood control districts within the state, and within them thousands of miles of washes and drainage ditches on land they do not own. The statute creating the districts does not impose, and we decline to impose by common law, the responsibility to compel, admonish, or cajole landowners to illuminate or barricade or replace with covered culvert every mile of ditch or wash that may foreseeably impose a hazard to passersby who might fall in.

## IV. CONCLUSION

¶ 30 Because the injury to Mrs. Sabina did not fall within the range of the District's duty and did not result from the recognizable risk that made the District's conduct negligent, the trial court's grant of summary judgment in favor of the District is affirmed.

CONCURRING: RUDOLPH J. GERBER, Presiding Judge, and SARAH D. GRANT, Judge.

---

3. Section 1.3, entitled "Statement of Purpose," provides:

   It is the purpose of this ordinance to promote the public health, safety, and general welfare, and to minimize public and private losses due to flood conditions in specific areas by provisions designed:
   A. To protect human life and health;
   B. To minimize expenditure of public money for costly flood control projects;
   C. To minimize the need for rescue and relief efforts associated with flooding and generally undertaken at the expense of the general public;
   D. To minimize prolonged business interruptions;
   E. To minimize damage to public facilities and utilities such as water and gas mains; electric, telephone and sewer lines; streets; and bridges located in areas of special flood hazard;
   F. To help maintain a stable tax base by providing for other uses and development in areas of special flood hazard so as to minimize future flood blight areas;
   G. To ensure that potential buyers are notified that property is in an area of special flood hazard;
   H. To ensure that those who occupy the areas of special flood hazard assume responsibility for their actions; and
   I. To maintain eligibility for State and Federal Disaster relief.

4. We note, however, the hydrologist's remark that the recipients of such an instruction would "[t]humb their noses at the county for asking someone to do that."