86 P.3d 954

**Bernadette BARRETT and William Barrett, both individually, and as wife and husband, and as surviving parents of Emily Barrett, deceased, Plaintiffs–Appellants,**

v.

**Thomas HARRIS, M.D. and Patricia Harris, his wife; Neonatology Associates, Ltd., an Arizona business entity, Defendants–Appellees.**

No. 1 CA–CV 03–0412.

Court of Appeals of Arizona, Division 1, Department A.

April 1, 2004.

Cluff & Associates By David H. Cluff, Mesa, Attorney for Plaintiffs–Appellants.

Bradford Law Offices, P.L.L.C. By Michael E. Bradford and Gallagher & Kennedy, P.A. By Wm. Charles Thomson, Kelly C. Mooney, Phoenix, Attorneys for Defendants–Appellees.

## OPINION

TIMMER, Judge.

¶ 1 Emily Barrett, newborn daughter of Bernadette and William Barrett, tragically died as a result of an accident that occurred as a nurse administered "blow-by" oxygen to the baby through an endotracheal tube. In a subsequent lawsuit, the trial court granted judgment as a matter of law for Dr. Thomas Harris, Emily's treating neonatologist, on the Barretts' claims that he caused Emily's death both by failing to advise Mrs. Barrett that Emily would be at risk for respiratory problems if born prematurely and by instructing the nurse to administer blow-by oxygen. In deciding whether the court ruled correctly, we examine and apply principles relating to proximate cause. For the reasons that follow, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶ 2 On August 12, 1997, Mrs. Barrett, who was approximately 33 weeks pregnant and in labor, was hospitalized at Yuma Regional Medical Center ("YRMC") and eventually diagnosed with sepsis, a urinary tract infection, and severe cardiomyopathy. She was transferred to a Phoenix hospital for a possible high-risk delivery, but did not deliver. Following her discharge two weeks later, she returned to Yuma.

¶ 3 On September 4, Mrs. Barrett, who was then 36 weeks pregnant and nearing full term, complained to her obstetrician of flank pain. Suspecting a possible kidney infection, the obstetrician immediately prescribed treatment with antibiotics and admitted Mrs. Barrett to YRMC. For the sake of Mrs. Barrett's health, he recommended continuing this treatment for two days and then inducing labor. Unsure of this course of action, Mrs. Barrett arranged a consultation with Dr. Harris, a neonatalogist, to address, among other matters, her concerns about inducing pre-term labor.

¶ 4 During the consultation held the next day, Mrs. Barrett asked Dr. Harris whether the baby's lungs were sufficiently mature for

early delivery. Dr. Harris answered that he had a "strong feeling that the baby should do well in all respects and that it was indeed time for delivery." Dr. Harris also stated that the stress of Mrs. Barrett's prior illness and her attendant treatment with steroids would have accelerated the development of her unborn child in a positive way. Dr. Harris did not inform Mrs. Barrett of any risks to her baby if labor were induced prematurely.

¶ 5 Mrs. Barrett's obstetrician induced labor on September 6, and Emily was born. She soon experienced difficulty breathing, and the next day Dr. Harris diagnosed Emily with respiratory distress syndrome. Dr. Harris surmised that Mrs. Barrett's prior illness had delayed the maturation of Emily's lungs, thereby causing the respiratory problems. Dr. Harris never informed Mrs. Barrett of this risk prior to Emily's birth.

¶ 6 Emily's respiratory condition continued to deteriorate. Consequently, on September 9, Dr. Harris inserted an endotracheal tube ("ET-tube") into Emily's windpipe in order to connect her to a respirator, which would assist her breathing. Dr. Harris then instructed nurse Peggy Neisen to deliver "blow-by" oxygen to Emily by placing a free-flowing concentration of oxygen near the baby's face, thus delivering oxygen to the baby's lungs through the ET-tube protruding from her mouth, until the connection was made to the respirator. In Dr. Harris' opinion, the administration of blow-by oxygen was the only way to get oxygen to Emily's lungs once the ET-tube was in place.

¶ 7 After giving the instruction to administer blow-by oxygen, Dr. Harris briefly turned his attention from Emily to the respirator settings. During this time, Nurse Neisen accidently brought the oxygen supply tube into such close proximity with the ET-tube that a closed system was created in which oxygen was rapidly introduced to Emily's lungs without any means of escape. As a result, Emily's lungs became hyperinflated until they collapsed, causing air to leak throughout her body, which inflicted severe

injury. Five days later, Emily died as a result of complications from the hyperinflation injury.

¶ 8 The Barretts filed suit against Dr. Harris for negligence, medical malpractice, and wrongful death.[1] Among other allegations, the Barretts asserted that Dr. Harris was liable for (1) failing to inform Mrs. Barrett during the neonatal consultation that Emily's lungs might be immature at the time labor was induced, thereby putting her at risk for respiratory problems, and (2) instructing Nurse Niesen to administer blow-by oxygen. At the close of the Barretts' case presented in the subsequent jury trial, the court granted Dr. Harris' motion for judgment as a matter of law ("motion for JMOL") on these theories of liability. The court ruled that the Barretts had failed to establish either that the neonatal consultation or the instruction to use blow-by oxygen proximately caused Emily's death. Thereafter, the jury returned a verdict in favor of Dr. Harris on the Barretts' remaining theories of liability. After the court denied the Barretts' motion for new trial, this appeal followed.

## STANDARD OF REVIEW

¶ 9 We review de novo the trial court's grant of the motion for JMOL, *Gemstar, Ltd. v. Ernst & Young,* 185 Ariz. 493, 505, 917 P.2d 222, 234 (1996), and consider the evidence and all reasonable inferences from the evidence in the light most favorable to the Barretts as the non-prevailing parties. *Monaco v. HealthPartners of S. Ariz.,* 196 Ariz. 299, 302, ¶ 6, 995 P.2d 735, 738 (App.1999). The trial court properly granted the motion if the facts presented in support of the contested theories had so little probative value that reasonable people could not have found for the Barretts. *Data Sales Co., Inc. v. Diamond Z Mfg.,* 205 Ariz. 594, 600, ¶ 29, 74 P.3d 268, 274 (App.2003); Ariz. R. Civ. P. 50(a)(1).

## DISCUSSION

### 1. Neonatal consultation

■ ¶ 10 The Barretts first argue that the trial court erred by granting the motion for

---

1. The Barretts also asserted claims against YRMC, Mrs. Barrett's treating obstetricians, and a perinatology group. The Barretts settled with

YRMC and the obstetricians and voluntarily dismissed the claims asserted against the perinatology group.

JMOL on their claim that Dr. Harris acted negligently and committed medical malpractice by failing to advise Mrs. Barrett during their consultation that Emily would be at risk for respiratory problems if born prematurely. In order to prevail on this claim, the Barretts were required to prove, among other things, that Dr. Harris' omission proximately caused Emily's death. *Standard Chartered PLC v. Price Waterhouse*, 190 Ariz. 6, 28, 945 P.2d 317, 339 (App.1996) (negligence); Ariz.Rev.Stat. ("A.R.S.") § 12–563 (2003) (medical malpractice).

¶ 11 A plaintiff proves proximate cause, also referred to as legal cause,[2] by demonstrating a natural and continuous sequence of events stemming from the defendant's act or omission, unbroken by any efficient intervening cause, that produces an injury, in whole or in part, and without which the injury would not have occurred. *Robertson v. Sixpence Inns of America, Inc.*, 163 Ariz. 539, 546, 789 P.2d 1040, 1047 (1990); *Markiewicz v. Salt River Valley Water Users' Ass'n*, 118 Ariz. 329, 338 n. 6, 576 P.2d 517, 526 n. 6 (App.1978). An "efficient intervening cause" is an independent cause that occurs between the original act or omission and the final harm and is necessary in bringing about that harm. *Robertson*, 163 Ariz. at 546, 789 P.2d at 1047. An intervening cause becomes a superseding cause, thereby relieving the defendant of liability for the original negligent conduct, "when [the] intervening force was unforeseeable and may be described, with the benefit of hindsight, as extraordinary." *Id.* (citations omitted).

¶ 12 Ordinarily, a plaintiff in a medical malpractice lawsuit must prove the causal connection between an act or omission and the ultimate injury through expert medical testimony, unless the connection is readily apparent to the trier of fact. *Gregg v. Nat'l Med. Health Care Servs., Inc.*, 145 Ariz. 51, 54, 699 P.2d 925, 928 (App.1985). Causation is generally a question of fact for the jury unless reasonable persons could not conclude that a plaintiff had proved this element. *Petolicchio v. Santa Cruz County Fair & Rodeo Ass'n, Inc.*, 177 Ariz. 256, 262, 866 P.2d 1342, 1348 (1994).

¶ 13 The trial court ruled that the Barretts failed to present sufficient evidence from which a reasonable juror could find that Dr. Harris' consultation proximately caused Emily's death. The court noted that the Barretts' causation expert, Dr. Jack Sills, testified that the sole cause of Emily's death was the hyperinflation of her lungs, which was caused only by Nurse Niesen's manner of administering blow-by oxygen. Dr. Sills, along with the Barretts' standard-of-care expert, Dr. Andre Vanderhal, additionally opined that absent the hyperinflation injury, Emily's condition was normal and her prognosis good. Because all the evidence showed that Emily would have been a typical, healthy baby absent the hyperinflation incident, the court concluded that even if Dr. Harris' advice caused Mrs. Barrett to agree to the inducement procedure, it did not cause Emily's death. The court alternatively ruled that the hyperinflation incident constituted a superseding cause that relieved Dr. Harris of liability.

¶ 14 The Barretts argue that the trial court erred in its ruling because they in fact presented sufficient evidence from which reasonable jurors could conclude that Dr. Harris' failure to inform Mrs. Barrett of the risk of respiratory problems associated with pre-term birth proximately caused Emily's death.[3] Mrs. Barrett testified that if Dr. Harris had informed her of this risk, she would not have permitted her obstetrician to induce labor, and Emily would not have suffered respiratory problems, which eventually resulted in treatment and the fatal hyperinflation injury. The Barretts contend that by providing negligent advice during the consultation, Dr. Harris proximately caused Emily's death by starting the chain of events that led to the hyperinflation injury.

---

2. *See* W. Page Keeton et al., *Prosser and Keeton on Torts* § 41, at 263 (5th ed.1984).

3. The Barretts also argue that they presented sufficient evidence that Dr. Harris fell below the standard of care when advising Mrs. Barrett during the neonatal consultation. However, because the trial court granted the motion for JMOL based solely on the issue of proximate cause, we need not address this issue.

¶ 15 To support their contention, the Barretts rely on the Restatement (Second) of Torts § 457 (1965) ("Restatement"), which provides as follows:

If the negligent actor is liable for another's bodily injury, he is also subject to liability for any additional bodily harm resulting from normal efforts of third persons in rendering aid which the other's injury reasonably requires, irrespective of whether such acts are done in a proper or a negligent manner.

Absent law to the contrary, we look to the Restatement for guidance.[4] *Webster v. Culbertson,* 158 Ariz. 159, 162, 761 P.2d 1063, 1066 (1988).

¶ 16 According to the Barretts, Dr. Harris' negligent advice caused bodily injury to Emily (respiratory distress syndrome) that necessitated treatment (assisted breathing) during which she suffered additional bodily harm (hyperinflation injury). Thus, applying § 457, the Barretts assert that a reasonable juror could conclude that Dr. Harris' consultation proximately caused Emily's death.

¶ 17 Although § 457 can apply to successive acts of medical malpractice,[5] the Barretts did not introduce any evidence that the neonatal consultation caused Emily's respiratory distress. Neither of the Barretts' medical experts opined that the consultation or the pre-term birth caused Emily's respiratory problem. Dr. Vanderhal testified only that a small risk always exists that a baby born at slightly more than 36 weeks, which is less than a week from full term (37–42 weeks), will have immature lungs and experience respiratory distress. He additionally opined that Emily's lungs might have been immature had she been born even four weeks later. The doctor did not opine on the prob-

ability that Emily's birth at 36–plus weeks rather than a later date caused her respiratory distress. In short, the evidence did not allow the jury to reasonably infer that the timing of Emily's birth caused her respiratory problems, which required treatment. *Robertson,* 163 Ariz. at 546, 789 P.2d at 1047 (holding plaintiff satisfies burden by presenting facts from which causal relationship may be inferred but cannot leave causation to jury's speculation); *Butler v. Wong,* 117 Ariz. 395, 396, 573 P.2d 86, 87 (App.1977) (concluding mere possibility that act or omission caused injury insufficient); *Kreisman v. Thomas,* 12 Ariz.App. 215, 218, 469 P.2d 107, 110 (1970) (noting "causation must be shown to be *probable* and not merely *possible,* and generally expert medical testimony that a subsequent illness or disease 'could' or 'may' have been the cause of the injury is insufficient") (italics in original).

¶ 18 Because no evidence demonstrated that Dr. Harris' consultation advice proximately caused Emily bodily injury, § 457 did not apply to impute liability to Dr. Harris for her subsequent medical treatment and injury. For this reason, the trial court properly granted the motion for JMOL for Dr. Harris on the Barretts' claim that he was liable for Emily's death due to the advice imparted or omitted during the neonatal consultation. In light of our conclusion, we do not address the trial court's alternative ruling that Dr. Harris was excused from any liability for the consultation because Nurse Niesen's administration of blow-by oxygen was a superseding cause of Emily's death.

### 2. Blow-by order

¶ 19 The Barretts next argue that the trial court erred by granting the motion for

---

4. No Arizona opinion has applied Restatement § 457. *Transcon Lines v. Barnes,* 17 Ariz.App. 428, 430 n. 1, 498 P.2d 502, 504 n. 1 (App.1972), which the Barretts cite, only mentions § 457 when relating the original tortfeasors' argument concerning their right to indemnity from a treating physician.

5. *See Daly v. United States,* 946 F.2d 1467, 1471 (9th Cir.1991) (stating § 457 applies to successive malpractice when subsequent treatment undertaken to mitigate harm inflicted by prior physician); *Rine v. Irisari,* 187 W.Va. 550, 553, 420

S.E.2d 541, 544 (1992) (same); *Carter v. Shirley,* 21 Mass.App.Ct. 503, 510–11, 488 N.E.2d 16, 20 (1986) (concluding § 457 is no less applicable to "physicians whose original negligence causes the intervention of a second physician who either *improperly diagnoses the case and performs an* unnecessary operation or makes a proper diagnosis and performs a necessary operation negligently"); *Lindquist v. Dengel,* 92 Wash.2d 257, 262–63, 595 P.2d 934, 937 (1979) (finding § 457 does not carve out a special exception for physicians).

JMOL on the Barretts' claim that Dr. Harris acted negligently and committed malpractice by ordering the administration of blow-by oxygen to Emily. The trial court ruled that the Barretts failed to present sufficient evidence from which a reasonable juror could find that the decision to use blow-by oxygen either breached the applicable standard of care or proximately caused Emily's death. The court reasoned that because the risk of hyperinflation due to use of blow-by oxygen was unforeseeable, Dr. Harris did not breach any standard of care. Additionally, the court concluded that the creation of the closed system during the administration of blow-by oxygen was unforeseeable and a superseding cause of Emily's death.

■■■ ¶ 20 The Barretts first contend that the court erred in its ruling because they indeed presented sufficient medical evidence that Dr. Harris' blow-by order fell below the standard of care. Dr. Harris does not dispute that the Barretts presented sufficient evidence on this issue to survive a JMOL, and we agree. Whether a physician breaches a duty by falling below the accepted standard of care is ordinarily shown by expert medical testimony. *Peacock v. Samaritan Health Serv.*, 159 Ariz. 123, 126, 765 P.2d 525, 528 (App.1988). Here, Dr. Vanderhal testified that Dr. Harris' decision to administer blow-by oxygen fell below the standard of care because this method was not an efficient means of delivering oxygen to an intubated baby. This testimony precluded a ruling as a matter of law that the Barretts failed to prove that Dr. Harris fell below the standard of care by ordering Nurse Niesen to administer blow-by oxygen.

¶ 21 The Barretts also contend that the court erred in its ruling because they presented sufficient evidence that Dr. Harris' blow-by order proximately caused Emily's hyperinflation injury and resulting death. The Barretts point to Dr. Vanderhal's testimony that use of blow-by oxygen subjected Emily to the risk of being injured by the inefficient delivery of oxygen. Because Emily was in fact injured by the delivery of blow-by oxygen, the Barretts argue that they sufficiently proved proximate cause to allow the claim to proceed to the jury. They maintain that they were not required to specifically show that the order to administer blow-by oxygen created a foreseeable risk of hyperinflation.

¶ 22 To support their position, the Barretts rely on the Restatement (Second) of Torts § 435 (1965), which provides, in pertinent part, as follows:

(1) If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable.

Arizona courts have applied § 435. *See Petolicchio*, 177 Ariz. at 263, 866 P.2d at 1349; *Thompson v. Better–Bilt Aluminum Prods. Co., Inc.*, 171 Ariz. 550, 554, 832 P.2d 203, 207 (1992); *Rossell v. Volkswagen of America*, 147 Ariz. 160, 169, 709 P.2d 517, 526 (1985).

■■■ ¶ 23 The Barretts submit "there can be little doubt" that Dr. Harris' order to administer blow-by oxygen to Emily was a "substantial factor" in harming Emily because Nurse Niesen created the fatal closed system while following this order. Thus, applying Restatement § 435, they contend that the fact Dr. Harris did not foresee nor should not have foreseen the hyperinflation injury did not relieve him from liability. Dr. Harris responds that § 435 is inapplicable because Arizona's adherence to the substantial factor premise articulated in that section is "questionable" in light of supreme court precedent. Regardless, he argues that applying Arizona law, the order to administer blow-by oxygen did not proximately cause Emily's death because the hyperinflation injury did not result from a recognizable risk created by use of blow-by oxygen. To resolve this dispute, we must decide what constitutes a "substantial factor" in bringing about harm to another person, as set forth in Restatement § 435, and whether Arizona follows § 435.

¶ 24 The meaning of "substantial factor" in § 435 is set forth in the Restatement (Second) of Torts §§ 431, 433 (1965) of that treatise. Section 431 provides that an actor's negligent conduct is a legal or proximate cause of harm if that conduct is a substantial factor in bringing about the harm and no rule

of law otherwise relieves the actor from liability. Comment a to that section explains that the term "substantial factor" is used to differentiate events that lead to the harm but would not be thought of by reasonable persons to have caused the harm.[6] Section 433 of the Restatement lists important considerations in determining whether negligent conduct is a substantial factor in producing harm.[7]

¶ 25 In *McDowell v. Davis*, 104 Ariz. 69, 71–72, 448 P.2d 869, 871–72 (1968), the supreme court disapproved a jury instruction informing jurors that proximate cause is demonstrated if the negligent act was a substantial factor, rather than a slight or possible factor, in producing the injury. The court wrote that if it could be assured that jurors understood the term "substantial factor" to mean not imaginary, illusive or insignificant, the court would not dispute its use. *Id.* at 71, 448 P.2d at 871. The court reasoned, however, that because the word "substantial" commonly refers to a large quantity, the instruction implied that a tortfeasor's act or omission must be a "large" cause of a plaintiff's damages. *Id.* at 71–72, 448 P.2d at 871–72. In fact, because a tortfeasor can be liable if its conduct contributed "only a little" to the plaintiff's damages, the court decided that use of the word in a jury instruction

would be misleading. *Id.* The court then reiterated the oft-stated rule that proximate cause consists of "any cause which in a natural and continuous sequence produces the injury and without which the result would not have occurred." *Id.*

¶ 26 We reject Dr. Harris' contention that the *McDowell* court "expressly rejected the 'substantial factor' test as a definition of proximate cause." Rather than rejecting that test, the court criticized the jury instruction for not using "the language of the test as set forth in the Restatement, § 431 to the extent that the meaning of the test as explained in the Restatement, §§ 432 and 433, [was not] properly conveyed to the jury." *Id.* at 72, 448 P.2d at 872. Thus, although the *McDowell* court rejected the use of the term "substantial factor" in the jury instruction at issue, the court did not reject the substantial-factor test. Indeed, twenty-four years later, the court expressly cited Restatement § 431 for the principle that a tort must be "a substantial factor in bringing about the harm" in order to be the proximate cause of that harm. *Thompson*, 171 Ariz. at 554, 832 P.2d at 207.[8] For these reasons, we hold that Arizona courts follow the substantial-factor test set forth in Restatement § 431 and referenced in § 435.

6. Comment a states in significant part as follows: "In order to be a legal cause of another's harm, it is not enough that the harm would not have occurred had the actor not been negligent. .... The word 'substantial' is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility, rather than in the so-called 'philosophic sense,' which includes every one of the great number of events without which any happening would not have occurred. Each of these events is a cause in the so-called 'philosophic sense,' yet the effect of many of them is so insignificant that no ordinary mind would think of them as causes."

7. Restatement § 433 lists as considerations (a) the number of other factors that contribute in producing the harm and the extent of the effect they have in producing it, (b) whether the actor's conduct created a force or series of forces that were in continuous and active operation up to the time of the harm or created a harmless situation unless acted upon by other forces for

which the actor was not responsible, and (c) the lapse of time between the negligent conduct and the harm.

8. In *Markiewicz*, 118 Ariz. at 338 n. 6, 576 P.2d at 526 n. 6, this court stated that the court in *McDowell* "reject[ed]" the Restatement's substantial-factor test because the word "substantial" implied that the defendant's act must be a "large" or "abundant" cause of injury. Thereafter, the supreme court in *Thompson* approved the Restatement test but cited the above-referenced explanation from *Markiewicz* without comment. *Thompson*, 171 Ariz. at 554, 832 P.2d at 207. We conclude from this citation that although the supreme court approves the substantial-factor test, it continues to adhere to the principle that an act proximately causes an injury, even when the negligent conduct contributed "only a little" to the injury, as long as the act produced the injury in a natural and continuous sequence, unbroken by any efficient intervening cause, and without which the injury would not have occurred. *See Robertson*, 163 Ariz. at 546, 789 P.2d at 1047; *McDowell*, 104 Ariz. at 71–72, 448 P.2d at 871–72.

¶ 27 We next consider whether the Barretts presented sufficient evidence that the blow-by order was a substantial factor in bringing about the hyperinflation injury. At a minimum, although other factors must be considered, *see* Restatement § 433, a negligent act or omission is a substantial factor in bringing about harm if it produced the injury in a natural and continuous sequence, unbroken by any efficient intervening cause, and without which the injury would not have occurred. *See Robertson,* 163 Ariz. at 546, 789 P.2d at 1047; *McDowell,* 104 Ariz. at 71–72, 448 P.2d at 871–72. According to Dr. Harris, any harm stemming from his alleged negligence in ordering blow-by oxygen was broken by Nurse Niesen's act in creating the fatal closed system, thereby superseding the blow-by order as a substantial factor in harming Emily.

¶ 28 "[N]egligence is not actionable in the abstract." *Sabina v. Yavapai County Flood Control Dist.,* 196 Ariz. 166, 171, ¶ 20, 993 P.2d 1130, 1135 (App.1999). In order to hold an actor liable for negligence, a plaintiff must prove that the plaintiff was in the foreseeable range of the negligent conduct, and that one of the dangers or risks that made the actor's conduct negligent brought about the injury. *Rossell,* 147 Ariz. at 169, 709 P.2d at 526; *McFarlin v. Hall,* 127 Ariz. 220, 222, 619 P.2d 729, 731 (1980); *Schnyder v. Empire Metals, Inc.,* 136 Ariz. 428, 430–31, 666 P.2d 528, 530–31 (App.1983); Restatement (Second) of Torts § 281 cmt. e (1965) (stating that when negligence of act consists in its recognizable tendency to subject another to particular hazard, the actor cannot be subject to liability for harm occurring otherwise than by other's exposure to that hazard); *see also* Restatement (Second) of Torts § 430 cmt. c (1965). Such dangers or risks may include the intervening negligent or criminal acts of others if intervention of the latter causes fell within the recognizable risk that made the conduct negligent. *Rossell,* 147 Ariz. at 169, 709 P.2d at 526.

¶ 29 Dr. Harris contends that the Barretts failed to introduce any medical evidence that the use of blow-by oxygen created a recognizable risk of hyperinflation. Specifically, Dr. Harris points to Dr. Vanderhal's testimony that the administration of blow-by oxygen fell below the standard of care solely because it was not an efficient means of delivering oxygen to the lungs of an intubated baby whose natural airway is restricted by the small diameter of the ET-tube. Based on this testimony, Dr. Harris contends that the only recognizable risk created by use of blow-by oxygen was that Emily would not receive sufficient oxygen. Because Emily was not injured by the lack of oxygen, and because no other medical evidence suggested that hyperinflation fell within the recognizable risk that allegedly made the blow-by order negligent, Dr. Harris asserts that his order was not a substantial factor in bringing about Emily's injury.

¶ 30 The Barretts argue that the following testimony from Dr. Vanderhal demonstrated that the hyperinflation injury was within the recognizable risk of using blow-by oxygen:

Q. Okay, and that hyperinflation incident, doctor, was totally unforeseeable, wasn't it, to Dr. Harris?

A. I would be—I think it is foreseeable that this baby would have a recurrence of air leak, and pneumothorax.[9] If you ask me, could he have foreseen that it was this massive, the answer's no.

Standing alone, it is possible to read this testimony as meaning that a recurrence of air leak and pneumothorax due to hyperinflation was foreseeable. Immediately after relating this testimony, however, Dr. Vanderhal clarified that hyperinflation could not occur until a closed system was created and that "creation of that closed system was totally unforeseeable." He further stated that he had never associated hyperinflation with the application of blow-by oxygen. Thus, when read in the context of Dr. Vanderhal's entire testimony, it is apparent that the portion of the doctor's testimony relied on by the Barretts referred to the foreseeablity that Emily would again develop air leak and pneumothorax due to receipt of an insuffi-

9. According to Dr. Vanderhal, a pneumothorax is a condition in which air exists outside the lung but remains inside the chest and the lung collapses either completely or partially. Emily had experienced bilateral pneumothoraces before being intubated.

cient amount of oxygen rather than as a result of hyperinflation.

¶ 31 In summary, the Barretts did not produce any evidence demonstrating that Nurse Niesen's creation of the fatal closed system stemmed from the recognizable risk that made Dr. Harris' decision to use blow-by oxygen negligent. *Rossell,* 147 Ariz. at 169, 709 P.2d at 526. The mere decision to use this method to deliver oxygen to Emily was not a substantial factor in bringing about injury. We decide that Restatement § 435 did not apply and the trial court correctly ruled as a matter of law that the mere order to use blow-by oxygen was not a proximate cause of Emily's fatal injury. *See Sabina,* 196 Ariz. at 171, ¶¶ 23–24, 993 P.2d at 1135 (holding flood control district's negligence in maintaining drainage ditch abutting parking lot did not cause plaintiff's fall into ditch from opposite side because injury well beyond foreseeable range of negligent failure to correct erosion problem on parking-lot side of ditch); *Gregg,* 145 Ariz. at 54, 699 P.2d at 928 (upholding summary judgment for hospital because expert medical opinion that hospital substandard for not adopting certain rules failed to state that this failure proximately caused patient's death); *Chavez v. Tolleson Elementary Sch. Dist.,* 122 Ariz. 472, 478, 595 P.2d 1017, 1023 (App.1979) (affirming JMOL for school district because abduction and murder of student after she wandered from campus without permission did not result from foreseeable risk created by alleged negligence of school in supervising student). In light of our decision, we do not address the court's alternative ruling that Nurse Niesen's actions constituted a superseding cause of Emily's death.

## CONCLUSION

¶ 32 For the foregoing reasons, we conclude that the trial court properly granted Dr. Harris' motion for JMOL on the Barretts' claims that he committed medical malpractice and was negligent by failing to inform Mrs. Barrett of the risk that Emily would have immature lungs if born prematurely, and by later ordering the administration of blow-by oxygen to Emily. The Barretts failed to introduce sufficient evidence

that these acts and omissions proximately caused Emily's death. Consequently, we affirm.

CONCURRING: JON W. THOMPSON, Presiding Judge and MAURICE PORTLEY, Judge.