NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

MICHELLE SAMPSON, et al., *Plaintiff/Appellant,*

*v.*

SURGERY CENTER OF PEORIA, LLC, et al., *Defendants/Appellees.*

No. 1 CA-CV 18-0113
FILED 12-26-2019

Appeal from the Superior Court in Maricopa County
CV2013-015707
The Honorable Hugh E. Hegyi, Judge *Retired*
The Honorable James Blomo, Judge *Retired*

**AFFIRMED IN PART; REVERSED IN PART**

COUNSEL

Lloyd Law Group PLLC, Payson
By Arthur E. Lloyd
*Counsel for Plaintiff/Appellant*

Holden & Armer PC, Phoenix
By DeeDee Armer Holden and Michael J. Ryan
*Counsel for Defendant/Appellee Surgery Center of Peoria, LLC*

Tucker & Miller LLP, Phoenix
By Kevin J. Tucker
*Counsel for Plaintiff/Appellee Antoine Burks*

J. Goodwin Law PLLC, Goodyear
By James C. Goodwin
*Counsel for Defendants/Appellees George Guido, M.D. and Valley
Anesthesiology Consultants, Ltd.*

---

## MEMORANDUM DECISION

Chief Judge Peter B. Swann delivered the decision of the court, in which
Presiding Judge James B. Morse Jr. and Judge David D. Weinzweig joined.

---

**S W A N N**, Chief Judge:

**¶1**          Four-year-old Amare' Burks died within two hours of his
post-operative discharge from an ambulatory surgery center.  His mother
brought this wrongful death action against the surgery center, the
anesthesiologist and his employer, among others.  The superior court
granted summary judgment for those defendants.  After review, we affirm
summary judgment as to the anesthesiologist and his employer, but we
reverse summary judgment as to the surgery center.

## FACTS AND PROCEDURAL HISTORY

**¶2**          Amare', accompanied by his mother Michelle Sampson
("Mother"), reported to Surgery Center of Peoria, LLC, for a scheduled
tonsillectomy and adenoidectomy to address his obstructive sleep apnea
("OSA").  The surgery proceeded routinely from 8:36 a.m. to 8:54 a.m. with
Dr. George Guido of Valley Anesthesiology Consultants, Ltd.,
administering anesthesia.  Amare' was discharged to the post-operative
anesthesia care unit ("PACU") at 9:29 a.m.

**¶3**          During his time in the PACU, Amare' repeatedly asked
Mother for his toy and he ingested some apple juice and possibly some
popsicle.  According to Mother, he did not cry in front of her but he
appeared uncomfortable and "really sleepy."

**¶4**          At 10:30 a.m., sixty-one minutes after Amare's admission to
the PACU, a nurse discharged him to Mother's care with discharge

2

instructions and prescriptions. The nurse's notes showed that Amare' had an eight-of-eight score on a vitals-release test. He was groggy but was sitting upright, and he accepted a sticker on his way out. Mother held him and the nurse helped her get him and his belonging into Mother's car.

¶5 Mother put Amare' to bed at home. Approximately two hours after discharge, she checked on Amare' and discovered that he had stopped breathing. Emergency personnel were unable to resuscitate him.

¶6 Mother brought a wrongful death action against multiple defendants, including Surgery Center, Dr. Guido, and Valley Anesthesiology Consultants. To establish standard of care and causation, she offered the opinions of pediatric anesthesiologist Dr. James Alan Greenberg. The superior court granted summary judgment in favor of the defendants on the basis that nothing in Dr. Greenberg's deposition testimony or affidavits (including a supplemental affidavit that the court had earlier stricken) showed a causal link between the defendants' conduct and Amare's death. The court denied Mother's motions for reconsideration and a new trial. She appeals.

**ISSUES**

¶7 Mother raises three issues on appeal:

1. Did the superior court err by granting summary judgment on the claim for premature discharge to either Dr. Guido/Valley Anesthesiology Consultants or the Surgery Center when plaintiff offered evidence to support causation, with or without Dr. Greenberg's supplemental affidavit?

2. Was it error to strike Dr. Greenberg's supplemental affidavit as unauthorized when ARCP Rule 56(c)(6) expressly allows supplementation of affidavits?

3. Was it error to imply that Dr. Greenberg's causation opinions might be inadmissible under Evidence Rule 702?

**DISCUSSION**

¶8 On review of a grant of summary judgment, we review de novo whether genuine issues of material fact exist and whether the superior court correctly applied the law. *Dreamland Villa Cmty. Club, Inc. v. Raimey*, 224 Ariz. 42, 46, ¶ 16 (App. 2010). "[W]e view the facts and reasonable

inferences in the light most favorable to the non-prevailing party." *Rasor v. Nw. Hosp., LLC*, 243 Ariz. 160, 163, ¶ 11 (2017).

¶9            A plaintiff alleging medical malpractice must prove both that "[t]he health care provider failed to exercise that degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession or class to which he belongs within the state acting in the same or similar circumstances" and that "[s]uch failure was a proximate cause of the injury." A.R.S. § 12-563. To establish proximate cause, the plaintiff must show "a natural and continuous sequence of events stemming from the defendant's act or omission, unbroken by any efficient intervening cause, that produces an injury, in whole or in part, and without which the injury would not have occurred." *Barrett v. Harris*, 207 Ariz. 374, 378, ¶ 11 (App. 2004). Causation in a medical malpractice action must be proved by expert testimony unless the connection between the conduct and the injury is readily apparent. *Id.* at ¶ 12. The plaintiff must show that causation is probable, not merely speculative. *See, e.g.*, *Robertson v. Sixpence Inns of Am., Inc.*, 163 Ariz. 539, 546 (1990) (recognizing that plaintiff cannot leave causation to jury's speculation); *Kreisman v. Thomas*, 12 Ariz. App. 215, 218 (1970) (noting that "causation must be shown to be [p]robable and not merely [p]ossible").

I.      DR. GREENBERG'S DEPOSITION TESTIMONY

¶10            At issue here is whether Amare's respiratory failure could have been prevented if he had been held in the PACU for a longer period. At oral argument on appeal, Surgery Center's counsel conceded that Dr. Greenberg's deposition testimony was sufficient to permit a reasonable jury to conclude that the standard of care required Amare' to be kept in the PACU for a longer period. We agree.

¶11            During his deposition, Dr. Greenberg variously stated that a patient should be retained for three hours, two hours, or at least one hour after surgery. When asked to clarify, the following exchange ensued:

> [Defense counsel]: [T]his is an article by Michael Smith at MedPage[1] today, which I'm not sitting here offering any view

---

[1]      The article that counsel asked Dr. Greenberg about indicated that the average pediatric type discharge for this surgery came after 1.47 hours in the recovery room, and the actual discharges ranged from 27 minutes to 7.25 hours. Dr. Greenberg stated the article was not authoritative because

about whether that's a reputable medical source, but what I am here to ask you is whether you have read the literature that basically says the same thing that this article says, which is there's no true standard of care for how long patients are observed after the procedure before being discharged when they have a tonsillectomy and adenoidectomy?

[Dr. Greenberg]: The standard of care that I'm familiar with is to be observed greater than an hour.

[Defense counsel]: Okay. Amare' Burks was observed for greater than an hour; correct?

[Dr. Greenberg]: No. All right. We're splitting hairs here. He was observed for 61 minutes, but what I mean is considerably more than that.

[Defense counsel]: . . . You're telling me that you have read in the literature that it's an hour. Is that a fair characterization of your belief?

[Dr. Greenberg]: What's a characterization is that my belief is that the standard of care is a longer time than Amare' was observed in the recovery room.

[Defense counsel]: Would you agree with me that there is not a consensus then in the literature about how long a pediatric patient should be observed?

[Dr. Greenberg]: I have not read any articles that say that the pediatric patient should be observed any less than two hours.

---

it was not in a peer-reviewed medical journal. Dr. Greenberg agreed that there has been an increased "sea change" towards more and more tonsillectomy and adenoidectomy surgeries in ambulatory surgical centers in the years between the article's publication in 2006 and the 2015 deposition. Dr. Greenberg did not reference any medical literature upon which he relied to form his opinion that more than an hour recovery was necessary.

[Defense counsel]: Well, you just said a minute ago that it was your understanding that the standard of care is an hour. Why the distinction?

[Dr. Greenberg]: Not an hour. More than an hour. And more than an hour could be 2 hours or it could be 100 hours.

[Defense counsel]: Well, more than an hour could be 61 minutes, correct?

[Dr. Greenberg]: Splitting hairs.

¶12        Dr. Greenberg agreed that the PACU nurse distributed appropriate medications to Amare', that Amare' had adequate pain and nausea control at discharge, and, finally, that there was nothing to alert medical personnel that the situation was anything other than routine. Specifically:

[Defense counsel]: Was there anything in the medical record that would have told Dr. Guido this child is going to die within the next two to three hours?

[Dr. Greenberg]: No.

[Defense counsel]: Other than your belief that children with [OSA] need to be kept longer than that one hour, can you tell me anything about Amare's specific medical condition at the times he was discharged that would have told Dr. Guido do not discharge this patient right now; he could die in the next two to three hours?

[Dr. Greenberg]: No.

. . .

[Defense counsel]: And we do know that based on what we know from the record and the observations made of this child and your opinions today, that there was nothing to alert anyone who cared for this child that he was going to be different than any other post tonsillectomy and adenoidectomy patients. Fair?

[Dr. Greenberg]: To the extent that the PACU nurse felt that this child looked like every other patient, fair.

6

[Defense counsel]: And [another of Mother's expert witnesses] also opined under oath that there was nothing to alert anybody to this child being anything or anyone out of the ordinary in terms of post tonsillectomy patients; correct?

[Dr. Greenberg]: Yes.

¶13    Dr. Greenberg's deposition testimony, although varying widely, was evidence that a patient should be kept from one to three hours. While we are not blind to the deficits and contraindications in the testimony, a reasonable jury could nonetheless find that the standard of care for observation was three hours. And if a jury were to find that the standard of care was three hours, it could properly infer that the early discharge was the probable cause of Amare's death three hours after admission.

¶14    Surgery Center makes much of the absence of expert testimony on the issue of causation. While expert testimony on causation is often necessary, we perceive no such necessity here. If a jury were to agree that the standard of care was breached as to time, then no expert evidence would be necessary to permit it to infer that a discharge in violation of that standard was the probable cause of a death that occurred within the time the child should have been observed under the standard of care.

¶15    Because there exists a triable issue as to whether Amare's discharge time constituted breach of the standard of care and thereby caused his death, we reverse and remand with respect to that aspect of the wrongful death claim.

¶16    The reversal pertains to Surgery Center only. Dr. Greenberg's testimony was insufficient to establish liability by Dr. Guido related to Amare's discharge. Dr. Greenberg's deposition testimony does not support Mother's theory that Dr. Guido should have personally examined Amare' before allowing him to be discharged. Dr. Greenberg admitted that he, himself, does not always examine patients, even pediatric tonsillectomy patients, before they are discharged. In fact, he testified that in his experience "[i]t would be unusual for the anesthesiologist to actually examine the patient." Further, with respect to Mother's theory that Dr. Guido should have personally written Amare's discharge orders, Dr. Greenberg agreed that the information and warnings contained in Amare's discharge orders was correct. He could not say what he would put in a typical discharge order of this type. And, while Dr. Greenburg continued

to assert that Dr. Guido had breached the standard of care by failing to personally author the discharge orders, he agreed that such a standard was not required by the American Society of Anesthesiologists ("ASA"), a group of which he is a member. He agreed, after reviewing the ASA standards, that one of them states: "In the absence of the physician responsible for the discharge, the PACU nurse shall determine that the patient meets the discharge criteria." He further admitted that the ASA standards do not require the doctor personally to write the discharge orders. Dr. Greenberg acknowledged that the medical record included that Dr. Guido, when writing his post-operative notes, had indicated that Amare' had met the discharge criteria. He also agreed there was nothing in the PACU nurse's notes that should have caused Dr. Guido to follow up with Mother.

## II.    DR. GREENBERG'S AFFIDAVITS

¶17        Dr. Greenberg authored two affidavits: the first to accompany the complaint and the second attached to Mother's "Second Supplemental Response" to the defendants' pending motion for summary judgment. In the latter affidavit, Dr. Greenberg stated:

> Had the proper level of monitoring been conducted and had a physician evaluated Amare' just prior to his being sent home, it most likely would have been discovered that the child was not ready for discharge, and the child's life could have been saved by keeping him longer for observation or admitting him to the hospital.

The defendants successfully moved to strike the supplemental affidavit as a "sham" affidavit written simply to preclude summary judgment. Though we conclude that Dr. Greenberg's deposition testimony was by itself sufficient to preclude summary judgment with respect to the Surgery Center, we briefly address the propriety of the court's order striking the supplemental affidavit.

¶18        The superior court has broad discretion to determine the admissibility of expert opinion evidence in summary judgment proceedings. *Mohave Electric Coop. v. Byers*, 189 Ariz. 292, 301 (App. 1997). We review evidentiary rulings for abuse of discretion. *Larsen v. Decker*, 196 Ariz. 239, 241, ¶ 6 (App. 2000). "An expert affidavit opposing a motion for summary judgment must set forth 'specific facts' to support an opinion." *Florez v. Sargeant*, 185 Ariz. 521, 526 (1996); *see also* Ariz. R. Civ. P. 56(e). Because the supplemental affidavit set forth no additional facts or new

evidence to support his opinion, the superior court did not abuse its discretion by deeming its conclusory opinions inadmissible. In view of that conclusion, we do not address Mother's contention that it was error for the superior court to "infer" that Dr. Greenberg's affidavit may not have met the standard set out by Ariz. R. Evid. 702.

## CONCLUSION

¶19 For the foregoing reasons, we affirm the judgment for defendants Dr. Guido and Valley Anesthesiology Consultants. We reverse summary judgment as to Surgery Center on the issue of the standard of care.

