IN THE
# ARIZONA COURT OF APPEALS
DIVISION TWO
_____

ANTOINETTE WINDHURST, A SINGLE/WIDOWED WOMAN,
ON BEHALF OF HERSELF, AND AS PERSONAL REPRESENTATIVE OF
THE ESTATE OF HER DECEASED HUSBAND, DAVID WINDHURST,
*Plaintiff/Appellant*,

*v.*

ARIZONA DEPARTMENT OF CORRECTIONS, A GOVERNMENTAL ENTITY;
CHARLES RYAN, IN HIS INDIVIDUAL CAPACITY AS THE DIRECTOR OF ARIZONA
DEPARTMENT OF CORRECTIONS, A GOVERNMENTAL ENTITY; STATE OF
ARIZONA, A GOVERNMENTAL ENTITY; CORIZON HEALTH, INC., A BUSINESS
DOMICILED IN ARIZONA,
*Defendants/Appellees*.

No. 2 CA-CV 2020-0162
Filed November 2, 2021
_____

Appeal from the Superior Court in Pima County
No. C20175978
The Honorable Brenden J. Griffin, Judge

**VACATED AND REMANDED**
_____

COUNSEL

Mesch Clark Rothschild, Tucson
By Nathan S. Rothschild and Bernardo Velasco

and

Crawford Law PLLC, Tucson
By Michael J. Crawford
*Counsel for Plaintiff/Appellant*

Qunitairos, Prieto, Wood & Boyer P.A., Scottsdale
By Rita J. Bustos, Anthony Fernandez, Dustin Christner, and Alyssa R. Illsley
*Counsel for Defendants/Appellees*

---

**OPINION**

Chief Judge Vásquez authored the opinion of the Court, in which Judge Brearcliffe and Judge Eckerstrom concurred.

---

V Á S Q U E Z, Chief Judge:

**¶1**        Antoinette Windhurst, individually and as the personal representative of her deceased husband David Windhurst, appeals from the trial court's partial grant of summary judgment in favor of appellees, Arizona Department of Corrections, Charles Ryan, the State of Arizona, and Corizon Health, Inc. (collectively, "Corizon"). On appeal, Windhurst argues the court erred by applying a heightened standard for her medical expert opinions and failed to view the evidence in the light most favorable to her in granting Corizon summary judgment as to her medical negligence claim. For the reasons stated below, we vacate and remand for further proceedings.

**Factual and Procedural Background**

**¶2**        We view the facts and reasonable inferences therefrom in the light most favorable to Windhurst, the party opposing the motion for summary judgment. *Braillard v. Maricopa County*, 224 Ariz. 481, n.11 (App. 2010). In December 2015, David Windhurst was incarcerated at the Florence state prison. He was paraplegic and had numerous chronic medical conditions, including diabetes mellitus, hypertension, obesity, kidney disease, and wounds to his lower back and buttocks. When he was first incarcerated, his conditions were stable. But because of his conditions, he was housed in the prison's infirmary, where his health care was provided by the Department of Corrections through its contractor, Corizon.

**¶3**        In February 2016, Mr. Windhurst was transferred to a hospital in a state of septic shock and remained there for over a month. Upon his release from the hospital, he was transferred to the Arizona State Prison Complex in Tucson, where he was housed in the infirmary under Corizon's care.

¶4             In November 2016, Mr. Windhurst was again admitted to the hospital with septic shock.  On December 25, he died in the hospital of infectious complications of diabetes mellitus.

¶5             Antoinette Windhurst filed a wrongful death action against Corizon, the Arizona Department of Corrections and its director Charles Ryan, and the State of Arizona, claiming medical malpractice and entitlement to relief under the Adult Protective Service Act, A.R.S. §§ 46-451 to 46-461.  She alleged that the defendants—Corizon as an institution and its medical personnel individually—through various failures, had "engaged in systematic repetitive negligent care" in treating her husband.

¶6             In support of her claims, Windhurst provided evidence including Mr. Windhurst's medical records and deposition testimony and reports from Dr. Zachary Rosner, Chief of Medicine for Correctional Health Services in New York City; Nurse Practitioner Tara Hood, who had worked as a nurse practitioner in a Connecticut correctional institute for ten years; and Registered Nurse Denise Panosky, who had fourteen years' experience as a professor "teaching students and nurses about practicing in a correctional setting."  Each provided an expert opinion that Corizon and various members of its staff had contributed to Mr. Windhurst's death due to their breaches of the standard of care or "lack of physician staffing, oversight, inexperience, and negligence."

¶7             Corizon moved for summary judgment, contending, among other things, that there was "no evidence that [it had] violated the standard of care [or] caused [Mr. Windhurst's] death."  In particular, Corizon argued that Windhurst had "failed to provide standard-of-care opinions against specific providers."   It maintained that Windhurst's expert doctor, Dr. Rosner, had only "broadly allege[d that] 'Clinicians' fell below the standard of care" and "fail[ed] to name a single medical doctor that fell below the standard of care, when he fell below the standard of care and how it caused injury to Mr. Windhurst."

¶8             Likewise, although Corizon acknowledged that Windhurst's registered nurse expert, Denise Panosky, had stated that "RN-level caregivers breached the standard of care for various reasons," it argued that Panosky's testimony had not proved that "negligence by any nurse caused actual harm to Mr. Windhurst."  Corizon further maintained that Panosky's and Hood's opinions were insufficient to establish causation based on their respective professional positions and their own statements.

**¶9** The trial court granted Corizon partial summary judgment, including summary judgment on the medical negligence claim.[1] The court stated that as to Windhurst's medical negligence claim, although it had "spent time trying to connect the dots," it "d[id not] see the medical expert testimony that links everything up." The court invited Windhurst to file a motion for reconsideration to point out evidence establishing that particular providers or categories of providers had breached standards of care and that those breaches had caused Mr. Windhurst's death.

**¶10** Although Windhurst filed a motion for reconsideration, the trial court denied it, ruling that the motion still failed to "'connect the dots' to make a *prima facie* showing on the statutory elements for medical malpractice." The court stated that Windhurst had failed to "specifically identify Corizon's individual health-care-provider employees and agents, and with corresponding expert testimony, explain how those employees and agents fell below the applicable standard of care, and with similar expert testimony explain how such failures were a cause of injury." It noted that "most of [Windhurst's] malpractice allegations are against Corizon as an entity or as to it[s] clinicians generally, not against specified individual health-care providers." Although the court acknowledged that Windhurst had "sprinkle[d] some allegations against specific individuals," it concluded that those allegations were "so intertwined with the general allegations that it is unclear whether [Windhurst] has the requisite corresponding expert testimony to make a *prima facie* showing that those individuals failed to meet the applicable standard of care, never mind that such failure was also a proximate cause of injury."

**¶11** The trial court's partial summary judgment was made final pursuant to Rule 54(b), Ariz. R. Civ. P., on Windhurst's medical negligence and negligence per se claims. This appeal followed. We have jurisdiction pursuant to A.R.S. §§ 12-120.21(A)(1) and 12-2101(A)(1).

---

[1]Although Windhurst's notice of appeal refers to a negligence per se claim, as to which the trial court also granted summary judgment, her opening brief only challenges the grant of partial summary judgment on her medical negligence claim. Accordingly, any argument relating to her negligence per se claim is waived, and we will not address it. *See* Ariz. R. Civ. App. P. 13(a)(6)-(7); *Nelson v. Rice*, 198 Ariz. 563, n.3 (App. 2000) (argument not raised in opening brief waived).

**Discussion**

¶12        Windhurst argues the trial court erred in granting partial summary judgment on her medical negligence claim because she provided sufficient evidence by qualified medical experts, establishing the necessary elements as required by Arizona law.  She maintains the court failed to view the evidence in the light most favorable to her, as it was required to do.  She contends that the court, in part because it failed to draw reasonable inferences in her favor, disregarded her experts' opinions about the relevant standards of care and breaches by Corizon as an institution; breaches by individual doctors, nurse practitioners, and registered nurses employed by Corizon; and "breaches by omission" by "entire classes of providers."  Finally, she argues that although she made the required showing that the breaches caused Mr. Windhurst's death, the court erroneously concluded that she had failed to show causation because she had not shown *how* the breaches caused injury.

¶13        We review both a grant of summary judgment and whether the trial court erred in applying the law de novo.  *Equihua v. Carondelet Health Network*, 235 Ariz. 504, ¶ 5 (App. 2014).  Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law," Ariz. R. Civ. P. 56(a), particularly "when a plaintiff fails to establish a *prima facie* case." *Gorney v. Meaney*, 214 Ariz. 226, ¶ 17 (App. 2007).

¶14        "In medical malpractice actions, as in all negligence actions, the plaintiff must prove the existence of a duty, a breach of that duty, causation, and damages." *Seisinger v. Siebel*, 220 Ariz. 85, ¶ 32 (2009).  These common law elements are partially codified under A.R.S. § 12-563, which requires a plaintiff to prove that a health care provider fell below the applicable standard of care by "fail[ing] to exercise that degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession or class to which he belongs within the state acting in the same or similar circumstances" and that "[s]uch failure was a proximate cause of the injury." *See Seisinger*, 220 Ariz. 85, ¶ 39.  A licensed health care provider can be a corporation or institution.  A.R.S. § 12-561(1)(a).

¶15        Expert medical testimony is generally necessary to establish the applicable standard of care in a medical negligence case.  *Seisinger*, 220 Ariz. 85, ¶ 33.  Experts testifying to the standards of care of medical professionals must satisfy both the requirements of Rule 702, Ariz. R. Evid., and the "heightened" requirements of A.R.S. § 12-2604.  *Seisinger*, 220 Ariz. 85, ¶¶ 39-40.  As relevant here, § 12-2604(A)(1) provides that an expert must

be "licensed as a health professional in this state or another state" and "[i]f the party against whom . . . the testimony is offered is or claims to be a specialist, specializes at the time of the occurrence that is the basis for the action in the same specialty or claimed specialty as th[at] party." The statute also provides that "[d]uring the year immediately preceding the occurrence giving rise to the lawsuit," the majority of the expert's professional time must have been spent in active clinical practice in that same profession or specialty, or as an instructor for that same profession or specialty. § 12-2604(A)(2). "If the defendant is a health care institution that employs a health professional against whom or on whose behalf the testimony is offered," the requirements in § 12-2604(A) apply when the expert testifies to the standard of care of such an employee. § 12-2604(B).

¶16        A health care institution, however, also has a standard of care independent from the medical professionals it employs. *See Thompson v. Sun City Cmty. Hosp., Inc.*, 141 Ariz. 597, 604 (1984) (hospitals and physicians have distinct standards of care). Section 12-2604(A) contains no explicit provision regarding who may testify regarding the institution's independent standard of care. And provisions within § 12-2604(A)(1)-(3) make little sense when applied to an institution itself, as an institution would not, for example, directly practice medicine, "claim[] to be a specialist," or become board certified. Thus, the only requirement § 12-2604(A) imposes on experts who testify about an institutional standard of care in a medical malpractice case is that the expert be "licensed as a health professional in this state or another state." However, the expert must still also satisfy Rule 702, which requires that the expert have "specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue." The parties and the trial court seem to agree that the specialized knowledge required in this case was medical care in the area of correctional medicine.

¶17        Similarly, causation must be proved through "expert medical testimony, unless the [causal] connection is readily apparent to the trier of fact." *Barrett v. Harris*, 207 Ariz. 374, ¶ 12 (App. 2004). However, unlike experts testifying to the standards of care for medical professionals, causation experts need only meet the requirements of Rule 702, as stated above. *See Rasor v. Nw. Hosp. LLC*, 244 Ariz. 423, ¶ 18 (App. 2018); *see also Lohmeier v. Hammer*, 214 Ariz. 57, ¶ 28 (App. 2006) ("[I]t is not necessary that an expert witness be a medical doctor in order to offer testimony regarding the causation of physical injuries so long as . . . the expert has specialized knowledge that will assist the jury in its resolution of that issue."). "Causation is generally a question of fact for the jury unless reasonable persons could not conclude that a plaintiff had proved this element."

*Barrett*, 207 Ariz. 374, ¶ 12. A plaintiff typically establishes causation by presenting evidence showing that the defendant's breach of the standard of care proximately caused the injury or death. *See* § 12-2604; *see also Thompson*, 141 Ariz. at 608 ("In the ordinary [medical malpractice] case the traditional rule prevails."). But where the "duty breached was one imposed to prevent the type of harm which plaintiff ultimately sustained," a plaintiff can establish causation by showing the "defendant's failure to exercise reasonable care increased the risk of the harm he undertook to prevent." *Thompson*, 141 Ariz. at 608. To survive summary judgment, a "[p]laintiff need only present probable facts from which the causal relationship reasonably may be inferred." *Robertson v. Sixpence Inns of Am., Inc.*, 163 Ariz. 539, 546 (1990).

¶18 Here, the trial court essentially disqualified Windhurst's standards-of-care experts by reasoning it could not "adequately make [a] comparison" of "the qualifications of the individual Corizon employees and agents who provided the underlying medical care with the qualifications of [Windhurst's] corresponding experts" because she did not adequately specify individual providers. But we do not interpret § 12-2604 as requiring that degree of specificity in cases like this one, involving allegations against a health care institution for a breach of its independent standard of care. It is sufficient to produce evidence that the institution itself fell below the applicable standard of care. *See* § 12-2604(B).

¶19 To the extent it was necessary for Windhurst to establish Corizon's breach of its standard of care by referring to evidence of the failures of individual providers, Windhurst's experts did name individual providers. Specifically, in opining about the breaches of the applicable standards of care for each of their respective provider classes, Dr. Rosner named Dr. Young; Panosky named Nurse Daemmer and Nurse Hughes; and Hood named Nurse Practitioners Castillo, Hogan, Roberts, and Ross. Moreover, the experts attributed specific actions and, more to the point, inactions by these individuals that contributed to Mr. Windhurst's injuries. Therefore, the trial court erred to the extent it based partial summary judgment on its perceived inability to compare the qualifications of Corizon with those of Windhurst's experts.[2]

---

[2] In her opening brief, Windhurst argues the trial court's reconsideration ruling "violated [her] right to Due Process" under the United States Constitution because it "never gave [her] the opportunity to demonstrate her experts were qualified." Because our determination that her experts were statutorily qualified is dispositive, we need not reach the

¶20         Corizon, citing § 12-2604, principally contends that Dr. Rosner was not qualified to testify about the standards of care of "clinicians" in disciplines other than his own. During oral argument, Windhurst conceded that Rosner was not qualified to do so. But Corizon does not explain why Rosner was unqualified to testify as to the standard of care that applied to Corizon as an institution and to the impact its failure to meet that standard had on the conduct of the individual clinicians who provided care.

¶21         Indeed, Dr. Rosner was a licensed health professional with specialized knowledge in the practice of correctional medicine. *See* § 12-2604(A); Ariz. R. Evid. 702. He had "worked in a leadership role in correctional medicine . . . since July 2013," and in that role he had "directly overseen the health care in multiple city jails," which included "managing and evaluating the care provided by hundreds of physicians, physician assistants . . . , and nurse practitioners," or "collectively 'Clinicians.'" To the extent the trial court interpreted Rosner's testimony as going beyond its proper scope, it was improper for it to disregard his otherwise proper testimony.

¶22         For example, it would be improper for Dr. Rosner to opine as to the standards of care applicable to board certified specialists such as dermatologists, nephrologists, or urologists, given that he was not also board certified in those areas. *See Baker v. Univ. Physicians Healthcare*, 231 Ariz. 379, ¶¶ 27-28 (2013) ("[E]xpert [must] be certified in the specialty at issue in the particular case."). But, as Windhurst argues, the trial court could have limited Rosner's testimony about any applicable standards of care of "clinicians" to only physicians within his area of expertise. And it was entirely proper for Rosner to say that Corizon's physicians, within his area of expertise and training, should have appreciated it was necessary to consult a specialist in any specialty areas or to follow their recommended treatment plans. And although it would be similarly improper for Rosner to opine as to the standards of care of nurses or nurse practitioners, *see* § 12-2604; *St. George v. Plimpton*, 241 Ariz. 163, ¶¶ 26-27 (App. 2016) (doctor not qualified to testify regarding nurse's standard of care), his references to these provider classes were in the context of the institution's standard of care. Certainly, opinions as to the breach of institutional standard of care may implicate or depend upon breaches of the standards of care of individual providers or classes of providers, including nurse or nurse

_____

constitutional issue. *See City of Sierra Vista v. Sierra Vista Wards Sys. Voting Project*, 229 Ariz. 519, ¶ 23 (App. 2012).

practitioner standards of care. To the extent Rosner's opinions as to the institutional standard of care are related to such other breaches and are supported by the opinions of the standards-of-care experts in those areas, he is permitted to refer to the failures of other providers.[3]

¶23        As the standard-of-care expert both as to the institution and its physicians involved in Mr. Windhurst's care, Dr. Rosner's reference to clinicians generally provided sufficient specificity to establish that Corizon had fallen below its standard of care by creating impediments to its clinicians' ability to perform their work. Notably, Corizon does not point to where it objected to Rosner's expert opinions regarding institutional standards of care; we generally would not consider such an evidentiary challenge for the first time on appeal. *See Woyton v. Ward*, 247 Ariz. 529, ¶ 16 (App. 2019).

¶24        In any event, in this case, Windhurst produced sufficient evidence to proceed to trial on her medical negligence claim against Corizon as an institution which, through its employees, provided care to Mr. Windhurst. Corizon nonetheless argues that Windhurst failed to "prove" that it, as an institution, breached any standard of care in its "overall administration" of the facility. We disagree. As to the institutional standard of care, Windhurst offered evidence that, at minimum, raised material issues of fact about whether Corizon's alleged breaches caused or contributed to Mr. Windhurst's death.

¶25        In his expert report, Dr. Rosner opined that it was "not unreasonable" to apply the standards of care for long-term care facilities set by the Centers for Medicare and Medicaid Services (CMS) to the prison infirmary. He identified several CMS standards that "appear[ed] clearly to have not been met." For example, Rosner cited the standards for incontinence care in 42 C.F.R. § 483.25(e), which provides, among other things, that a "facility must ensure that . . . [a] resident who is incontinent of bladder receives appropriate treatment and services to prevent urinary tract infections and to restore continence to the extent possible." § 483.25(e)(2)(iii). Rosner opined that this standard had been breached by the institution's "failure to adequately manage the suprapubic catheter over time, including mismanagement of leakage and lack of

---

[3]Nothing in this decision is intended to restrict the trial court's ability to preclude any medical expert from offering standard-of-care opinions about medical specialties to which they do not belong.

consultation with a urologist when persistent leakage remained a problem."

¶26            As another example, Dr. Rosner cited the CMS skin integrity standards of care, which provide that a facility must ensure that "[a] resident with pressure ulcers receives necessary treatment and services, consistent with professional standards of practice, to promote healing, prevent infection and prevent new ulcers from developing." § 483.25(b)(1)(ii). He opined that "[t]he worsening of skin breakdown and tracking wounds as documented in the record are consistent with not meeting this standard."

¶27            Dr. Rosner also cited the CMS standard of care for the availability of emergency services in 42 C.F.R. § 483.30(d), which states that a "facility must provide or arrange for the provision of physician services 24 hours a day, in case of an emergency." Rosner opined that this standard was "clearly not met" when Mr. Windhurst was "gravely ill" in his final days in the infirmary and "nurses concerned for his well-being were unable to promptly contact a higher level Clinician for management decisions," and when they finally made contact with a physician, "no[] prompt in person evaluation . . . resulted." Finally, Rosner opined that these and other "breaches of the applicable community standards of care . . . more probably than not caused or contributed to [Mr. Windhurst's] eventual death."

¶28            Corizon maintains that Windhurst "is unclear about how" it, as an institution, breached a standard of care because she did not specifically allege, for example, negligent training, hiring, or supervising, or that particular policies or procedures violated institutional standards of care. But to withstand summary judgment, Windhurst was not required to use magic words to establish that Corizon had a duty and breached it. *See* A.R.S. § 12-563; *Seisinger*, 220 Ariz. 85, ¶ 32. Nevertheless, as discussed above, Dr. Rosner did point to several institutional factors that "systemically limited" providers' individual ability to provide the "level of care that Mr. Windhurst required," including "substandard environmental conditions," "inadequate staffing," and "poor . . . tracking systems."

¶29            As to the negligence of the health care providers employed by Corizon, Windhurst directed the trial court to "numerous breaches by omission to entire classes of providers, which necessarily includes every individual in each class who encountered [Mr. Windhurst] and failed to render required care," including catheter care, wound care, and infection diagnosis and care.

¶30          In her statement of facts, Windhurst pointed to Panosky's testimony about deficiencies with respect to the catheter care provided by the nursing staff and its potential contribution to her husband's death. Panosky first opined generally that she did not believe that Mr. Windhurst had received reasonable and appropriate care by the nursing staff. When she was asked "what was lacking and when was it lacking specifically as far as standard of care," she mentioned, among other things, that nurses did not have or request the supplies needed for his catheter change. Later, Panosky mentioned that nurses would "need to make sure that the catheter was working correctly, that it was clean and dry, and that it wasn't leaking." She testified that here, however, Mr. Windhurst "had . . . leakage around his catheter, multiple, multiple times, or continued leaking, and that wasn't really addressed." Although nursing staff documented "many times" that the catheter was leaking, they "were waiting for the right equipment to change the catheter." She testified that "as nurses, it's . . . our job to make sure that the cleanliness of [our] wound care, of changing dressings, is either sterile technique or clean technique, so having a leaking catheter isn't good infection control." Panosky stated that "[i]f you know you have a leaking catheter and that can lead to infection, and infection can lead to sepsis, I would say yes, it's unprofessional not to continue to get the equipment and do what a patient needs to keep him from declining in his health." Finally, Panosky opined that the issue with the leaking catheter "could have contributed to his sepsis." Together, this testimony articulates (1) a nursing standard of care: that nursing staff should remedy a catheter leak when it is discovered; (2) a breach of that standard of care through an ongoing failure by the nursing staff to remedy Mr. Windhurst's catheter leaks, attributed to a lack of supplies or proper cleaning; and (3) causation testimony that this breach could have contributed to the sepsis underlying Mr. Windhurst's death.

¶31          To the extent Panosky was imprecise in stating standards of care in her testimony, her written report was more specific. She articulated several standards of care for nurses, including those established by statute in the Nurse Practice Act, A.R.S. §§ 32-1601 to 32-1669 and A.A.C. R4-19-101 to R4-19-815, including that registered nurses must "[i]ntervene[] on behalf of a client when problems are identified." A.A.C. R4-19-402(C)(4)(e). A juror could reasonably infer from Panosky's testimony that the nursing staff's failure to address the continued leakage around Mr. Windhurst's catheter breached that standard.

¶32          In her statement of facts, Windhurst also identified many of Panosky's observations and opinions relating to breaches of standards of wound care by Corizon's nursing staff in the Tucson infirmary. According

11

to Panosky, Mr. Windhurst's open wound needed daily care. She testified that the wound needed to be kept clean, given daily dressings, monitored closely, and pressure on it needed to be relieved either via a pressure-relieving surface or a program of turning and repositioning. Failure in any of those areas could lead to infection, rapid deterioration, and hospitalization. Panosky testified to several aspects of the nursing staff's care of the wound that led her to conclude that the nursing staff did not provide "reasonable and appropriate wound care." Panosky stated that the nursing staff's documentation failed to show that the wound was regularly cleaned or dressed. She noted that at various times in the Tucson infirmary, (1) Mr. Windhurst had "reported feeling hot"—a sign of fever, a symptom of infection—and "they didn't even take his temperature"; (2) nurses had reported visible signs of infection, including "green, odiferous . . . drainage with his wounds being red," but "there was no phone call or report to a medical provider"; and (3) there had been no needed wound care solution. She observed that in June 2016, nursing staff documented that his wound had worsened but "there was no evidence that nursing obtained any orders to address this wound or a different way to change his dressing." Documentation also showed that bedding changes had occurred only "approximately once a month," which was a concern when there were "leaking wounds or leaking catheters."

¶33 Panosky tied the nursing staff's deficiencies in catheter care to the development of Mr. Windhurst's wounds and related care. She noted that he had been bedded on an egg-crate mattress which held the urine leaking from the catheter, and the "[s]tandard of care wouldn't be to [leave a wound patient laying] on an egg crate mattress that's all wet." If urine from the leaking catheter, for which "nothing really had been done" for "six months," were running down his sides or to his back, it would "increase a risk for infection . . . in his wound." Reasonable jurors could infer that, with respect to Mr. Windhurst's wound care, the failures to change his bedding, regularly clean and dress his wound, address the catheter leak, and obtain a change in orders as signs of a worsening infection appeared, were among what Panosky termed the "many lifesaving interventions the nurses could have done that they didn't do."

¶34 Given the standard of care that nurses must intervene on behalf of the patient when problems are identified, A.A.C. R4-19-402(C)(4)(e), jurors could reasonably conclude that these failures were breaches of that standard of care. And as for Panosky connecting these breaches to certain individuals, she specifically stated Nurse Daemmer's failure to promptly perform a urine dip after noting Mr. Windhurst had signs of a serious infection "definitely breached the standard of care by not

getting these things done when they were ordered." Panosky also testified that Nurse Hughes's failure to immediately contact a provider "was inappropriate" when she identified critical changes in Mr. Windhurst's appearance and noted he was "at risk for sepsis."

¶35 Panosky further testified that several other inactions of the nursing staff had "attributed [sic] to causing his infection getting worse, . . . him going into sepsis, and eventually dying." From this testimony, and the report on which her testimony was based, a reasonable juror could conclude that the deficiencies and delays in Mr. Windhurst's care by the nurses were a contributing cause of his death.

¶36 Corizon maintains that Panosky was not able to provide causation testimony and was unqualified to do so in any event. It points out that at her deposition, Panosky testified that she was "[n]ot specifically" "offering any medical causation opinions in this case." Based on our review of the record, she nonetheless did so, and, contrary to Corizon's argument, it was not improper for her to render an opinion about causation. *See Rasor*, 244 Ariz. 423, ¶ 25 (proper for nurse qualified under Rule 702 to testify as causation expert). But, because Corizon challenges Panosky's qualifications under Rule 702 for the first time on appeal, any such argument is waived. *See* Ariz. R. Evid. 103(a)(1) (party must timely object or move to strike to preserve claim of error in admission of evidence); *Woyton*, 247 Ariz. 529, ¶ 16 (challenge to expert's qualifications not raised before trial court are waived on appeal). And even if not waived, Panosky would be qualified to offer causation opinion testimony as to Corizon's registered nurses. As a registered nurse practicing in correctional medicine, Panosky had "specialized knowledge that [would] assist the jury" in resolving whether Corizon's nurses fell below the standard of care and that the failure caused or contributed to the injuries. *See Lohmeier*, 214 Ariz. 57, ¶ 28. Similarly, we reject Corizon's argument that Panosky was not qualified to give a causation opinion because she is not permitted to make a medical diagnosis. "To the extent there is a distinction between the 'diagnosing' that nurses are permitted to do under Arizona law" and "a 'medical diagnosis,' we find it a distinction without a difference as it pertains to the threshold question of whether nurses in general may give causation testimony in medical malpractice cases." *Rasor*, 244 Ariz. 423, ¶ 18.

¶37 As to the nurse practitioners, Hood stated that those who treated Mr. Windhurst breached various standards of care and she specifically named several nurse practitioners whose breaches "more probably than not caused or contributed to [Mr. Windhurst's]

death." Among other things, she noted that during Mr. Windhurst's decline in November 2016, Nurse Practitioner Castillo failed to meet the standard of care set forth in A.A.C. R4-19-508(A), that a nurse practitioner:

> shall refer a patient to a physician or another health care provider if the referral will protect the health and welfare of the patient and consult with a physician and other health care providers if a situation or condition occurs in a patient that is beyond the [nurse practitioner's] knowledge and experience.

Hood documented numerous failures by Castillo to meet this standard of care by not obtaining a physician consult or proper diagnostic testing during Mr. Windhurst's mid-November decline leading up to his hospitalization. Hood reported that Castillo had failed to act despite Mr. Windhurst's "worsening clinical presentation"; "poorly controlled diabetes"; "altered mental status," including confusion; a "perforated tympanic membrane" that developed with "pain and malodorous discharge" from the ear and which was not examined "because of the lack of otoscopic equipment"; a "hard and tumor-like" mass that recently appeared in his jaw which "increase[ed] [in] size" as Mr. Windhurst "continued to decline"; a diagnosed urinary tract infection; and a worsening rash that did not resolve over Castillo's "fourteen encounters" with Mr. Windhurst in October and November. Hood additionally stated that Castillo had never documented the status of Mr. Windhurst's chronic wounds during any of her encounters with him; failed to order a blood count, the results of which ultimately indicated a problem "other than a simple urinary tract infection"; and failed to monitor his kidney function via appropriate testing. Hood's testimony provides sufficient evidence for a jury to reasonably infer that the negligent omissions by Corizon's nurse practitioners contributed to Mr. Windhurst's death.

¶38 As to the negligent omissions of Corizon's physicians, Windhurst pointed out in her statement of facts that "Dr. Rosner opined that, from a medical management perspective, the Standard of Care required [Mr. Windhurst] to be sent to the hospital between November 9 and 11." Rosner gave that opinion in his deposition, and noted in his report that Mr. Windhurst was "transfer[red] to a hospital only once he was ill enough to warrant admission to an intensive care unit." "Earlier action," according to Rosner, would likely have "avoided the critical condition that developed." For example, at one point, nurses were unable to contact a "higher level Clinician for management decisions" and once the treating

physician, Dr. Young, was finally contacted, he failed to conduct an in-person evaluation, thereby failing to both appreciate Mr. Windhurst's declining vital signs and provide adequate care. A juror could reasonably infer that the failure to send Mr. Windhurst to the hospital earlier breached Corizon's duty to "provide or arrange for the provision of physician services 24 hours a day, in case of an emergency," 42 C.F.R. § 483.30(d), and that this breach was among those that, according to Rosner, caused or contributed to Mr. Windhurst's death.

¶39        In sum, viewing all evidence and inferences in the light most favorable to Windhurst, we determine that a jury could reasonably infer that Corizon and its health care providers fell below the applicable standards of care thereby increasing the risk of Mr. Windhurst's death. Having resolved these issues in Windhurst's favor, we agree that the trial court misapplied the law and did not view the evidence in the light most favorable to her. Thus, the court erred in granting partial summary judgment on Windhurst's medical negligence claim.

## Disposition

¶40        For the foregoing reasons, we vacate the trial court's grant of partial summary judgment to Corizon and remand for further proceedings consistent with this opinion. Because Corizon is not the prevailing party, we deny its requested attorney fees and costs on appeal. *See* A.R.S. § 12-341. Windhurst did not request attorney fees, but she is entitled to recover her costs upon compliance with Rule 21, Ariz. R. Civ. App. P.