IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

ANTOINETTE WINDHURST, A SINGLE/WIDOWED WOMAN, ON BEHALF OF
HERSELF, AND AS A PERSONAL REPRESENTATIVE OF THE ESTATE OF HER
DECEASED HUSBAND, DAVID WINDHURST,
*Plaintiff/Appellant,*

*v.*

ARIZONA DEPARTMENT OF CORRECTIONS, A GOVERNMENTAL ENTITY; RYAN
THORNELL, IN HIS INDIVIDUAL CAPACITY AS THE DIRECTOR
OF ARIZONA DEPARTMENT OF CORRECTIONS; STATE OF ARIZONA, A
GOVERNMENTAL ENTITY; CORIZON HEALTH, INC., A BUSINESS
DOMICILED IN ARIZONA,
*Defendants/Appellees.*

No. CV-21-0288-PR
Filed October 11, 2023

Appeal from the Superior Court in Pima County
The Honorable Brenden J. Griffin, Judge
No. C20175978
**REVERSED AND REMANDED**

Opinion of the Court of Appeals, Division Two
252 Ariz. 240 (2021)
**VACATED**

COUNSEL:

Rita J. Bustos (argued), Anthony J. Fernandez, Dustin A. Christner, Alyssa
R. Illsley, Quintairos, Prieto, Wood & Boyer, P.A., Scottsdale, Attorneys for
Corizon Health, Inc., Arizona Department of Corrections, Ryan Thornell,
and the State of Arizona

Nathan S. Rothschild, Bernardo M. Velasco (argued), Mesch Clark Rothschild, Tucson; and Michael J. Crawford, Crawford Law, PLLC, Tucson, Attorneys for Antoinette Windhurst

Eileen Dennis GilBride, Jones, Skelton & Hochuli P.L.C., Phoenix, Attorney for Amici Curiae Banner Health, Dignity Health, HonorHealth, Mutual Insurance Company of Arizona, and Phoenix Children's Hospital

David L. Abney, Ahwatukee Legal Office, P.C., Phoenix; and Daniel Rubinov, RAJ Law PLLC, Phoenix, Attorneys for Amicus Curiae Arizona Association for Justice/Arizona Trial Lawyers Association

————————

JUSTICE BEENE authored the Opinion of the Court, in which CHIEF JUSTICE BRUTINEL, VICE CHIEF JUSTICE TIMMER, and JUSTICES BOLICK, and LOPEZ joined.[*]

————————

JUSTICE BEENE, Opinion of the Court:

**¶1**    A plaintiff who brings a medical malpractice action must prove that a medical institution or individual provider fell below the applicable standard of care. *See* A.R.S. §§ 12-563, -561(1)(a); *Seisinger v. Siebel*, 220 Ariz. 85, 94 ¶ 32 (2009). Expert medical testimony is necessary to establish the applicable standard of care, and experts testifying to the standard must satisfy the requirements of Arizona Rule of Evidence 702 and A.R.S. § 12-2604. *Seisinger*, 220 Ariz. at 94–95 ¶¶ 33, 39–40.

**¶2**    In this case, we apply these legal principles to the following issues: (1) whether § 12-2604 applies to medical institutions, and under what circumstances; (2) whether the court of appeals erred in concluding that the jury could infer causation; and (3) whether a registered nurse may testify regarding the cause of death in a medical malpractice case. For the

———————

[*] Justices William G. Montgomery and Kathryn H. King recused themselves from this matter.

reasons set forth in this opinion, we hold that § 12-2604's requirements do not apply to claims against medical institutions not based on vicarious liability; Windhurst presented appropriate expert causation testimony and, therefore, the jury did not have to infer causation; and a registered nurse may testify about the cause of death in a medical malpractice case if Rule 702's requirements are met.

**BACKGROUND**

¶3        In December 2015, David Windhurst ("David") was incarcerated at the Arizona State Prison in Florence. David was paraplegic and had various chronic medical issues, including diabetes mellitus, hypertension, obesity, kidney disease, and injuries to his back and buttocks. Because of his medical conditions, David was placed in the prison's infirmary, where Arizona Department of Corrections ("ADOC") provided his health care through its contractor Corizon Healthcare Inc. ("Corizon"). When Corizon began caring for David, his medical conditions were stable.

¶4        In February 2016, David went into septic shock and was transferred to a hospital where he remained for over a month. After his release from the hospital, David was taken to a state prison in Tucson where he was housed in the infirmary under Corizon's care. In November 2016, David was admitted again to the hospital in septic shock, and on December 25, he died due to infectious complications of diabetes mellitus.

¶5        David's widow, Antoinette Windhurst ("Windhurst") filed a wrongful death action against Corizon, ADOC and its director, and the State of Arizona, claiming, among other things, medical malpractice. Windhurst alleged both institutional negligence by Corizon and vicarious liability based on the negligence of its medical personnel. In support of her claims, Windhurst provided David's medical records, as well as deposition testimony and reports from three expert witnesses: Zachary Rosner, a medical doctor; Tara Hood, a nurse practitioner; and Denise Panosky, a registered nurse. At the time, Dr. Rosner was the chief of medical services for the New York City jail system; Hood had worked for over ten years as a nurse practitioner in a correctional facility; and Panosky had over fourte

years of experience as a professor, teaching students about nursing in a correctional facility setting.

**¶6**         Corizon moved for summary judgment, arguing that there was no evidence that it violated the standard of care or caused David's death.  Specifically, Corizon asserted that Windhurst failed to provide standard-of-care opinions regarding specific providers.  It also claimed that Dr. Rosner only alleged that "clinicians" fell below the standard of care and did not specify which particular clinician fell below the standard of care or how such clinician's care caused David's death.  Corizon also argued that, as a nurse, Panosky was not qualified to establish causation based on her professional position.

**¶7**         The trial court granted Corizon's motion on the medical negligence claim because it did not "see the medical expert testimony that links everything up."  The court invited Windhurst to file a motion for reconsideration that "tied together . . . either a specific doctor or doctors, a specific nurse or nurses; what standard of care applied and that that particular provider or category of providers breached; how they breached it; [and] what corresponding expert says that."

**¶8**         Windhurst filed a motion for reconsideration.  In her motion, Windhurst pointed to evidence that Corizon failed to treat David's wounds and properly care for his catheter, failed to follow specialist recommendations, and failed to diagnose and treat David's sepsis.  She also cited testimony from the record where Dr. Rosner, Hood, and Panosky gave causation testimony.  The trial court denied the motion, however, finding that Windhurst still did not "connect the dots."  Windhurst appealed.

**¶9**         The court of appeals vacated the trial court's grant of summary judgment on the medical negligence claim. *Windhurst v. Ariz. Dep't of Corrs.*, 252 Ariz. 240, 249 ¶ 40 (App. 2021).  After reviewing the expert opinions of Dr. Rosner, Hood, and Panosky, the court concluded that these witnesses gave sufficient testimony about the institutional and individual standards of care for Corizon and its personnel, respectively. *Id.* at 245 ¶ 19, 246 ¶¶ 23–27.  Additionally, the court of appeals held that Windhurst's experts gave sufficient causation testimony. *Id.* at 246 ¶ 27, 247

¶ 30, 249 ¶ 37. Finally, relying on *Rasor v. Northwest Hospital LLC* (*Rasor I*), 244 Ariz. 423 (App. 2018), the court concluded that Panosky met the expert qualification standards of Rule 702 and could testify regarding the cause of death. *Windhurst*, 252 Ariz. at 248–49 ¶ 36.

**¶10**     We granted review because this case presents recurring issues of statewide concern. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution.

## DISCUSSION

**¶11**     We review the entry of summary judgment de novo, viewing the facts in the light most favorable to Windhurst as the nonmoving party. *See S. Point Energy Ctr. LLC v. Ariz. Dep't of Revenue*, 253 Ariz. 30, 33 ¶ 10 (2022). Similarly, we review questions of statutory interpretation de novo. *State v. Ariz. Bd. of Regents*, 253 Ariz. 6, 12 ¶ 22 (2022).

## I.

**¶12**     Windhurst's wrongful death action alleged both institutional negligence by Corizon and vicarious liability based on the negligence of Corizon's medical personnel.[1]  Here, we must determine whether § 12-2604's standard of care requirements for an expert witness in a medical malpractice case apply to an institutional liability claim. Answering this question requires us to interpret § 12-2604.

**¶13**     "Our task in statutory construction is to effectuate the text if it is clear and unambiguous." *BSI Holdings, LLC v. Ariz. Dep't of Transp.*, 244 Ariz. 17, 19 ¶ 9 (2018). "In doing so, we interpret statutory language in view of the entire text, considering the context and related statutes on the same

---

[1] Corizon insists that Windhurst failed to specifically plead institutional negligence. Though Windhurst did not use the exact phrase "institutional negligence" in her complaint, she alleges that Corizon breached the applicable standard of care by failing to adhere to state law, as well as its own policies and procedures. This allegation satisfies Arizona's pleading standards by indicating the type of litigation involved and putting Corizon on notice. *See Cullen v. Auto-Owners Ins. Co.*, 218 Ariz. 417, 419 ¶ 6 (2008).

subject," *Molera v. Hobbs*, 250 Ariz. 13, 24 ¶ 34 (2020) (cleaned up) (quoting *Ariz. Chapter of the Associated Gen. Contractors of Am. v. City of Phoenix.*, 247 Ariz. 45, 47 ¶ 7 (2019)), giving the words "their ordinary meaning unless it appears from the context or otherwise that a different meaning is intended." *State ex rel. Brnovich v. Maricopa Cnty. Cmty. Coll. Dist. Bd.*, 243 Ariz. 539, 541 ¶ 7 (2018) (citation omitted).

¶14 In all negligence actions, including medical malpractice, "the plaintiff must prove the existence of a duty, a breach of that duty, causation, and damages." *Seisinger*, 220 Ariz. at 94 ¶ 32. For medical malpractice specifically, a plaintiff must prove that (1) "[t]he health care provider failed to exercise that degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession or class to which he belongs within the state acting in the same or similar circumstances," and (2) "[s]uch failure was a proximate cause of the injury." A.R.S. § 12-563; *see also Baker v. Univ. Physicians Healthcare*, 231 Ariz. 379, 384 ¶ 12 (2013) ("In medical malpractice cases, plaintiffs must show that a health care provider breached the appropriate standard of care and the breach resulted in injury."). "Unless malpractice is grossly apparent, the standard of care must be established by expert medical testimony." *Rasor v. Nw. Hosp., LLC* (*Rasor II*), 243 Ariz. 160, 163 ¶ 12 (2017).

¶15 Section 12-2604(A) provides additional expert witness qualifications that are required to testify in a medical malpractice action:

A. In an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of practice or care unless the person is licensed as a health professional in this state or another state and the person meets the following criteria:

1. If the party against whom or on whose behalf the testimony is offered is or claims to be a specialist, specializes at the time of the occurrence that is the basis for the action in the same specialty or claimed specialty as the party against whom or on whose behalf the testimony is offered. If the party against whom or on whose behalf the testimony is offered is

or claims to be a specialist who is board certified, the expert witness shall be a specialist who is board certified in that specialty or claimed specialty.

2. During the year immediately preceding the occurrence giving rise to the lawsuit, devoted a majority of the person's professional time to either or both of the following:

(a) The active clinical practice of the same health profession as the defendant and, if the defendant is or claims to be a specialist, in the same specialty or claimed specialty.

(b) The instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession as the defendant and, if the defendant is or claims to be a specialist, in an accredited health professional school or accredited residency or clinical research program in the same specialty or claimed specialty.

3. If the defendant is a general practitioner, the witness has devoted a majority of the witness's professional time in the year preceding the occurrence giving rise to the lawsuit to either or both of the following:

(a) Active clinical practice as a general practitioner.

(b) Instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession as the defendant.

¶16  Under subsection (A), the qualifications of a standard of care witness are dependent on what "health profession" the defendant practices and whether the defendant is a "specialist" or "general practitioner." § 12-2604(A)(1)–(3). Because the defendant in this case, Corizon, is not engaged in a "health profession" and is neither a "specialist" nor "general practitioner," § 12-2604 does not apply. Though these terms are not defined in Title 12, their use in § 12-2604 and their definitions in related statutes support this conclusion.

**¶17**        Section 32-3201 defines "[h]ealth professional" as "a *person* who is certified or licensed" to work as a member of certain professions listed in Titles 32 and 36.[2] A.R.S. § 32-3201(2) (emphasis added). Under this statute, doctors, nurse practitioners, and nurses are included as health professionals. Though statutory references to "persons" generally include both legal entities and natural persons, *see* A.R.S. § 1-215(29), § 32-3201(2) only refers to natural persons and we decline to apply a statute governing individual licenses to a legal entity. *See generally Fleming v. State Dep't of Pub. Safety*, 237 Ariz. 414, 417 ¶ 12 (2015) (refusing to apply a meaning that "leads to impossible or absurd results") (quoting *Orca Commc'ns Unlimited, LLC v. Noder*, 236 Ariz. 180, 182 ¶ 9 (2014)).

**¶18**        Section 12-2604 also distinguishes between "health professional[s]" and institutional entities. Section 12-2604(B) expressly applies to "health care institution[s]." It reads, in relevant part: "If the defendant is a health care institution that employs a health professional against whom or on whose behalf the testimony is offered, the provisions of subsection A apply as if the health professional were the party or defendant." § 12-2604(B). This section applies when an institution is a defendant in a negligence action based on the actions of a health professional it employs. If an institution could be a "health professional," § 12-2604(B) would be superfluous. It therefore follows that, under § 12-2604, "health professional[s]" must be individuals, as opposed to institutions. *See generally Nicaise v. Sundaram*, 245 Ariz. 566, 568 ¶ 11 (2018) (disapproving of an interpretation that renders a provision superfluous).

**¶19**        Similarly, "[s]pecialist" is defined as an individual. *See* A.R.S. § 32-1800(21) (defining specialist as a physician who has completed additional training or is certified by a specialty board). Although "general practitioner" is not defined in Title 32 or 36, absent statutory definitions, courts generally give words their ordinary meaning and may look to dictionary definitions. *Chaparro v. Shinn*, 248 Ariz. 138, 141 ¶ 14 (2020). The Oxford Advanced Learner's Dictionary defines "general practitioner" as "a doctor who is trained in general medicine and who treats patients in a local

---

[2] Section 32-3201(2) references certain articles in Title 36, but those articles are not related to health care institutions like Corizon.

8

community rather than at a hospital." *General Practitioner*, Oxford Advanced Learner's Dictionary, https://www.oxfordlearnersdictionaries. com/us/definition/english/general-practitioner?q=general+practitioner (last visited Sept. 13, 2023). The Merriam-Webster Dictionary defines "general practitioner" as "a physician or veterinarian whose practice is not limited to a specialty." *General Practitioner*, Merriam-Webster, https://www.merriam-webster.com/dictionary/general%20practitioner (last visited Sept. 13, 2023). Both definitions refer to a general practitioner as an individual person, rather than a group or a collective. Thus, it follows that, like the terms "health professional" and "specialist," the term "general practitioner" is defined as an *individual* engaged in the practice of medicine.

**¶20**       After considering § 12-2604(A)(1)–(3), its context, and related statutes on the subject, we conclude that an institution cannot be a licensed health professional because an institution cannot be a natural person. *See* § 32-3201(2). And thus, in a suit against a medical institution, it would be impossible for a plaintiff to produce an expert in the "same health profession as the defendant." *See* § 12-2604(A). Similarly, it would be impossible for a plaintiff to present an expert under § 12-2604(A)'s requirements because an institution, by definition, cannot be a "specialist" or "general practitioner." Accordingly, § 12-2604(A) is inapplicable to claims based on a theory of institutional liability.

**¶21**       In this case, Windhurst alleged claims against Corizon for institutional negligence and vicarious liability for the negligent conduct of its employees. *See Kopp v. Physician Grp. of Ariz., Inc.*, 244 Ariz. 439, 441–42 ¶¶ 9–12 (2018) (explaining that institutional claims can be proven either by showing an independent duty to the patient or through vicarious liability of the institution's employees). As this Court has previously stated, a health care institution has a standard of care independent from the medical professionals it employs. *See Thompson v. Sun City Cmty. Hosp., Inc.*, 141 Ariz. 597, 604 (1984) (noting that hospitals and physicians have distinct standards of care). Because § 12-2604(A) is not applicable to a claim for institutional negligence, an expert on this issue need only satisfy Rule 702, which requires that the witness have "specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue." Ariz. R. Evid. 702.

¶22        We conclude that the trial court erred in granting partial summary judgment based on its inability to compare the qualifications of the Corizon employees that provided medical care with the qualifications of Windhurst's corresponding experts. Windhurst provided proper expert standard-of-care testimony for each class of medical provider and these experts presented appropriate testimony regarding how Corizon's medical providers' actions, or inactions, contributed to David's injuries. *See* Part II(B)–(D) ¶¶ 34–45. Testimony of these failures supported Windhurst's institutional negligence claim.

¶23        Windhurst also provided competent expert evidence regarding the standard of care that applied to Corizon as an institution. Regarding this claim, Dr. Rosner's general reference to clinicians provided the requisite specificity to establish that Corizon had fallen below its standard of care by failing to remove obstacles to the clinicians' ability to perform their work. *See* Part II(A) ¶¶ 28–33. Moreover, evidence that an entire class of providers failed to exercise appropriate care suggests an institutional failure. Therefore, we conclude that, when it is unclear which provider breached the standard of care, an expert on institutional standards of care may address an alleged breach by establishing that a class of providers failed to exercise appropriate care.

## II.

¶24        Next, we address whether the court of appeals erred in concluding that the jury could infer causation in contravention of *Sampson v. Surgery Center of Peoria, LLC*, 251 Ariz. 308 (2021).

¶25        Causation is a legal requirement for any medical malpractice claim. *See Evans v. Bernhard*, 23 Ariz. App. 413, 415 (1975). "Causation is generally a question of fact for the jury unless reasonable persons could not conclude that a plaintiff had proved this element." *Barrett v. Harris*, 207 Ariz. 374, 378 ¶ 12 (App. 2004). It requires the plaintiff to show "a natural and continuous sequence of events stemming from the defendant's act or omission, unbroken by any efficient intervening cause, that produce[d] an injury, in whole or in part, and without which the injury would not have

occurred." *Sampson*, 251 Ariz. at 311 ¶ 15 (quoting *Barrett*, 207 Ariz. at 378 ¶ 11). Furthermore, the injury must be "probable, not merely speculative." *Id*.

**¶26** In most medical malpractice cases, a plaintiff must establish causation using expert testimony. *Id*. ¶ 13. The narrow exception is when the malpractice is so "readily apparent" that a jury can infer causation. *Id*. (quoting *Rasor II*, 243 Ariz. at 166 ¶ 32). When the standard of care or cause of death is disputed on a matter requiring medical knowledge, causation by inference should be limited to those situations where causation is "grossly apparent." *Id*. at 312 ¶ 19 (quoting *Rasor II*, 243 Ariz. at 163 ¶ 12).

**¶27** Here, Corizon argues that because the cause of death is disputed and not readily apparent, expert causation testimony is required to explain how the alleged breaches by the institution and its employees caused or contributed to David's death.

## A. Medical Institution

**¶28** As previously indicated, Windhurst alleged institutional negligence by Corizon and vicarious liability based on the negligence of its personnel. In support of this claim, Dr. Rosner stated in his report that it was appropriate to apply the standards of care set by the Centers for Medicine and Medicaid Services ("CMS") for long-term care facilities to a prison infirmary. Dr. Rosner cited the CMS standard of care for the availability of emergency services which states that a "facility must provide or arrange for the provision of physician services 24 hours a day, in case of an emergency." 42 C.F.R. § 483.30(d). Rosner stated that this standard was "clearly not met" because David became "gravely ill" and "nurses concerned for his well-being were unable to promptly contact a higher level of Clinician for management decisions" and "[w]hen the physician was finally contacted there was not prompt in person evaluation that resulted." Dr. Rosner further stated:

> When a system is structured in such a way that an infirmary setting does not have a physician working in an infirmary setting around the clock it must have accessible physician

11

oversite [sic] and be prepared to rapidly escalate care for unstable patients. When the on-call physician is both unable to come in to evaluate a decompensating patient while also not willing to remotely advise transfer to an emergency room where physician services are available around the clock, that system cannot be said to have provided or "arrange[d]" for the provision of physician services 24 hours a day.

¶29 Dr. Rosner provided additional expert causation testimony regarding this claim when he expressed that "the prison was unable to come close to approaching the standard of care that Mr. Windhurst required" and that Corizon's "inability to provide this level of care should have been easily recognizable . . . and failure to acknowledge and act on this led to Mr. Windhurst's decompensation, development of severe complications of an otherwise treatable infection, and ultimately his premature death." Dr. Rosner's statements satisfied the requirement for expert causation testimony because he testified that Corizon and its employees breached the emergency-services-availability standard of care and caused David's death.

¶30 Dr. Rosner also discussed another institutional standard of care he believed Corizon breached: proper maintenance of medical records. In his report, Dr. Rosner stated that a "medical record is the commonly accepted location for communicating clinical information from a variety of sources." He asserted that the standard of maintaining medical records is to "directly populat[e] the medical record in a way which could be assessed by multiple different care givers." He added that "[s]uch direct population of the medical record with lab results is standard for current electronic health records and critical since easy access to review a patients [sic] past lab results is a critical component of having a complete picture of the patient being provided care."

¶31 According to Dr. Rosner, however, Corizon breached this standard by improperly maintaining medical records. In his report, Dr. Rosner stated that "lab results were routinely reviewed on paper or via email" by Corizon's clinicians. But he also noted that a Corizon provider "communicat[ed] only via word-of-mouth sign-out with nurses and not

reviewing the chart for documentation of patient progress in some instances, and in others not receiving lab results in the electronic record," and often, results or "concerning findings" would not reach higher level clinicians. In discussing this breach, Dr. Rosner asserted that "[t]his significant structural flaw was particularly contributory in this case" because it delayed obtaining the results of a lab report "which . . . under normal standards would have warranted a change in [care] management."

¶32 Dr. Rosner also stated that Corizon's clinicians "appear to have been working in an environment and under obligations that systematically limited their individual ability to provide a level of care that Mr. Windhurst required." This included "poor electronic and manual tracking systems critical to providing adequate care to a patient with Mr. Windhurst's medical needs." Thus, Dr. Rosner concluded that the "actions and inactions" by Corizon providers represented a breach of the standard of care that "more probably than not caused or contributed to David Windhurst's eventual death."

¶33 Windhurst identified the standard of care regarding the maintenance of medical records, discussed how the standard was breached, and sufficiently specified how the breach caused David's death. Accordingly, Windhurst's competent expert testimony would prevent the jury from having to infer causation on the institutional negligence claim.

### B. Nurse Practitioners

¶34 Next, we examine whether the jury would have to infer that the alleged negligent conduct of Corizon's nurse practitioners caused David's death.

¶35 Windhurst's expert, Hood, stated that several nurse practitioners who treated David breached multiple standards of care. One standard cited by Hood required nurse practitioners to recognize the limits of their "knowledge and experience by consulting with or referring patients to other appropriate health care professionals if a situation or condition occurs that is beyond the[ir] knowledge and experience . . . or if the referral

13

will protect the health and welfare of the patient." A.R.S. § 32-1601(23)(d)(vi).

¶36 In her report, Hood documented numerous breaches of this standard. Regarding one such breach, Hood noted that in November 2016, Castillo, a Corizon nurse practitioner, failed to realize David's deteriorating condition and subsequently did not raise any concerns to an attending physician, despite a serious decline in David's health. Hood also stated that another Corizon nurse practitioner, Ross, breached the standard of care regarding several aspects of David's case including prescribing a contraindicated medication for David, who suffered from chronic kidney disease. Despite repeated encounters with David, Hood noted that Ross prolonged David's pain and suffering by failing to consult with a physician or order testing regarding his skin condition. Hood then concluded that the "actions and inactions by nurse practitioners . . . working with or for Corizon Health, represent breaches of the applicable standards of care that more probably than not caused or contributed to David Windhurst's death."

¶37 Hood's expert causation testimony corresponds with the causation opinion reached by Dr. Rosner. After reviewing the health care services provided by Corizon, Dr. Rosner opined that the "actions and inactions by Clinicians . . . working with or for Corizon Health, represented breaches of the applicable community standards of care that more probably than not caused or contributed to David's . . . eventual death."

¶38 Windhurst's experts identified the appropriate standards of care for nurse practitioners, discussed how these standards were breached, and specified how these breaches caused David's death. Thus, the jury will not have to infer causation.

## C. Registered Nurses

¶39 Finally, we consider whether the jury would have to infer causation regarding the alleged negligent conduct of Corizon's registered nurses.

¶40     In her report, Windhurst's nursing expert, Panosky, identified several standards of care that were breached by Corizon's nurses. One standard requires nurses to "intervene on behalf of a client when problems are identified." Ariz. Admin. Code R4-19-402(C)(4)(e) (cleaned up). Panosky listed numerous breaches of this standard. She stated that Corizon's nurses should have escalated care when David's urine output fell below a certain amount for two consecutive nights in November 2016. She also noted that during this time, Hughes, a Corizon nurse, reported that David had no appetite, consistently had critically low blood sugars, and had gray-tinted skin. Despite this, Hughes did not notify a higher-level provider for over forty-eight hours. Panosky noted that another breach of this standard occurred on November 18, 2016, the day that David was admitted to the hospital for a second time. Panosky stated that David was in respiratory distress on this day and that the treating nurse could not reach a higher-level provider for over nine hours. In her deposition, Panosky testified that if a nurse could not reach a higher-level provider for such an extended period and the patient is in respiratory distress, the nurse should have called 911.

¶41     In addition, Panosky testified about breaches of a different nature: following orders. Panosky stated that "it's the nurse's job to follow the orders that were written" and to make sure that an order gets done "the day it's ordered." She testified that, especially given David's condition before his November 18 hospitalization, the Corizon nurse Daemmer breached this standard by waiting three days to complete one of David's lab tests. A provider ordered the test on November 11. Panosky opined that, had Daemmer made sure the order was completed according to the standard, the results would have led any reasonable provider to send David to the hospital sooner, which would have increased his chance of survival.

¶42     Because Panosky provided competent expert opinion that Corizon's nurses collectively breached identified standards of care, and Dr. Rosner opined that these breaches caused David's death, *see* Part II(B) ¶ 37, the jury will not be left to infer causation regarding this claim.

¶43     Contrary to Corizon's claims, Windhurst presented sufficient expert causation evidence to satisfy *Sampson*. A jury could reasonably rely

15

on this expert evidence to determine the cause of David's death without making any impermissible inferences. Accordingly, when considering the causation evidence in the light most favorable to Windhurst, we conclude that the trial court erroneously granted summary judgment for Corizon.

## D. Doctor Young

¶44    In partially granting Corizon's summary judgment motion, the trial court also overlooked crucial details in Dr. Rosner's report and deposition. Like the evidence establishing Corizon's standard of care, *see* Part I ¶¶ 20–23, the report and deposition allege that Dr. Young's breach of the relevant standard caused David's death. The court based its ruling on its assessment that Windhurst failed to "specifically identify Corizon's individual health-care-provider employees and agents," and "explain [with corresponding expert testimony] how those employees and agents fell below the applicable standard of care . . . [and] how such failures were the cause of injury." It also noted that "most of [Windhurst's] malpractice allegations are against Corizon as an entity or as to its clinicians generally, not against specified individual health-care providers." The trial court added that although Windhurst had "sprinkle[d] some allegations against specific individuals, . . . those allegations are so intertwined with the general allegations that it is unclear whether [Windhurst] has the requisite corresponding expert to make a prima facie showing that those individuals failed to meet the applicable standard of care, never mind that such a failure was also a proximate cause of injury."

¶45    The record in this case, however, belies the trial court's inability to "connect the dots" between Corizon's individual health care providers and corresponding expert testimony on the standard of care and causation. For example, Dr. Rosner identified Dr. Murray Young, a Corizon employee, concluding that Dr. Young breached the applicable standard of care in treating David and that his breach contributed to David's injuries. Specifically, Dr. Rosner noted that Dr. Young overlooked uremia as a cause of David's itching and instead assumed that his skin condition resulted from "self-mutilation." This assumption, Dr. Rosner opined, was not within the standard of care and caused David's condition to worsen. The

trial court therefore erred by granting partial summary judgment to Corizon on the vicarious liability claim for Dr. Young's breach.

## III.

**¶46** We conclude by turning to whether a registered nurse may testify regarding the cause of death in a medical malpractice case.

**¶47** While the standard of care must be proven by expert medical testimony, *Seisinger*, 220 Ariz. at 94 ¶ 33, causation experts need only meet the requirements of Rule 702. *See Rasor I*, 244 Ariz. at 428 ¶ 18. As previously indicated, under Rule 702, "[f]or a witness to be qualified as an expert, he or she need only possess 'skill and knowledge superior to that of [people] in general.'" *State v. Romero*, 239 Ariz. 6, 10 ¶ 17 (2016) (second alteration in original) (quoting *State v. Girdler*, 138 Ariz. 482, 490 (1983)). If a registered nurse possesses "specialized knowledge" that would "help the [jury] to understand the evidence or to determine a fact in issue" such as cause of death, then that individual may testify as an expert regarding that issue. *See* Ariz. R. Evid. 702.

**¶48** Here, Corizon argued to the trial court that Panosky testified outside the scope of her practice and that she was not qualified to testify as an expert under Rule 702. However, because the trial court did not decide this issue, we decline to address the merits of this question on appeal. *See State v. Salazar-Mercado*, 234 Ariz. 590, 594 ¶ 13 (2014) (noting that the trial court determines whether Rule 702 is met, and appellate courts view that determination for an abuse of discretion). On remand, the trial court shall consider whether Panosky is qualified to testify as an expert regarding causation under Rule 702.

**¶49** Corizon also asserts that Panosky's causation testimony is duplicative and violates Arizona Rule of Civil Procedure 26(b)(4)(F)(i), which allows each side in a case to presumptively call only one retained or specially employed expert to testify on an issue. Although Corizon concedes in its supplemental brief that this "was not an issue in the court of appeals," it nonetheless requests that we address this claim. Because the issue was not raised in the court of appeals or in Corizon's petition for

review, and was not fully briefed, we decline to do so. *See* Ariz. R. Civ. App. P. 23(d)(1) (requiring petition for review to set forth the "issues that were decided by the Court of Appeals that the petitioner is presenting for Supreme Court review").

## CONCLUSION

**¶50** Although we largely affirm its conclusions and approve of its reasoning, we vacate the court of appeals' opinion to replace its reasoning with our own. We reverse the trial court's grant of summary judgment and remand for the court to consider Corizon's Rule 702 argument regarding Panosky and for further proceedings consistent with this opinion.